1

2

3                        BEFORE THE

4                     LOUISIANA STATE

5              BOARD OF MEDICAL EXAMINERS

6

7     ********************************************

8

9                   IN THE MATTER OF

10            GREGG SPAULDING HUNTER, MD

11                   Invoice No.

12                    14-A-003

13

14    ********************************************

15

16           A Formal Hearing was reported at the

17    Louisiana State Board of Medical Examiners

18    Office, 630 Camp Street, New Orleans,

19    Louisiana  70130, on Monday, July 21, 2014,

20    commencing at 3:03 p.m.

21

22

23           BY:  Shelley A. Sampey, RPR/CCR

24                Certified Court Reporter

25

**Exhibit E**

1                A P P E A R A N C E S

2

3          For the Louisiana State Board of

     Medical Examiners:

4

5        **BOARD MEMBERS:**

6        John Michael Burdine, MD,
         Vice-President

7
         Kweli J. Amusa, MD
8        Member

9        Joseph Dewey Busby, Jr., MD
         Member
10
         Kenneth Barton Farris, MD
11       Member

12       Roderick Vince Clark, MD
         Member
13
         Christy Lynn Valentine, MD
14       Member

15
         **BOARD STAFF PRESENT:**
16
         Cecilia Mouton, MD
17       Director of Investigations

18       Emily Dianne Eisenhaure, MD
         Assistant Director of Investigations
19
         Grace Hammons, CMBI,
20       Administrative Program Director

21       Christine Holder
         Administrative Program Specialist A
22
         Lillie Rodgers
23       Administrative Program Specialist A

24

25

**Exhibit E**

```
1          FOR THE COMPLAINANT:

2     Ralph H. Wall, Esquire

3
           FOR THE RESPONDENT:
4
      Nelson D. Taylor, Esquire
5

6          INDEPENDENT COUNSEL:

7     Judge Frederick S. Ellis

8

9

10

11

12

13

14

15

16

17

18

19

20
           Shelley A. Sampey, #93011
21         Certified Court Reporter
            State of Louisiana
22         Registered Professional
            Reporter, #818291
23

24

25
```

**Exhibit E**

<u>I N D E X</u>

                                              <u>PAGE</u>

1  Caption...................................1

2  Appearances...............................2, 3

3  Index.....................................4

4  Reporter's Certificate....................136


<u>E X A M I N A T I O N</u>

LESLEY R. RYE, RN, MSN:

BY MR. WALL............................17, 67

BY MR. TAYLOR...........................40


GREGG S. HUNTER, MD:

BY MR. TAYLOR...........................72,
                                        106

BY MR. WALL.............................85


A ▇▇▇▇   B ▇▇▇▇▇▇▇▇▇▇▇▇:

BY MR. WALL............................119

BY MR. TAYLOR..........................126


<u>E X H I B I T S</u>

Exhibit book for Complainant A 1-12........16

Proffer

1   Correspondence from Roger          61
    Wortham, MD to Cecelia Mouton, MD
    dated July 14, 2014

1    2      E-mail from Roger Wortham, MD to        61
            Leslie Rye dated April 9, 2014
2
     3      Psychiatric Crime Database             64
3            document

4    4      Psychiatric Crime Database             65
            document
5

6   Respondent

7    1      Response from Chase Bank               83

8    2      Response from Chase Bank               83

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit E**

1    DR. BURDINE:

2              "In the Matter of Gregg

3         Spaulding Hunter, M.D.," may I have a

4         motion to go into Executive Session

5         under Louisiana Revised Statute

6         42:6.1, as this matter involves the

7         discussion of the character,

8         professional competence, health or

9         misconduct of a physician?

10   DR. BUSBY:

11             So moved.

12   DR. CLARK:

13             Seconded.

14   DR. BURDINE:

15             Dr. Busby has moved that the

16        Board go into executive session for

17        the discussion and hearing of this

18        matter under Louisiana Revised Statute

19        42:6.1, and it has been seconded by

20        Dr. Clark.  All those in favor, say

21        "Aye."

22   THE BOARD:

23             Aye.

24   DR. BURDINE:

25             All those opposed?

**Exhibit E**

```
 1   THE BOARD:
 2                    (No response.)
 3   DR. BURDINE:
 4                    Any abstaining?
 5   THE BOARD:
 6                    (No response.)
 7   DR. BURDINE:
 8                    For the record, Dr. Amusa,
 9            Dr. Clark, Dr. Busby, Dr. Farris, and
10            Dr. Valentine have voted in favor of
11            holding Executive Session.
12                    The Board will now take up the
13            Formal Hearing of the matter of Gregg
14            Spaulding Hunter, M.D., Case No.
15            14-A-003.  In the Administrative
16            Complaint filed in these proceedings,
17            he has been charged with violation of
18            the following Louisiana Medical
19            Practice Act, Louisiana Revised
20            Statutes 37:1261-1292, and the Board's
21            Rules:
22                    A.  A violation of Louisiana
23            Revised Statute 37:1285A(13)
24            "Unprofessional conduct;"
25                    B.  A violation of Louisiana
```

1            Revised Statute 37:1285A(26) "refusing

2            to submit to the examinations and

3            inquiry of an examining committee of

4            physicians appointed or designated by

5            the Board to inquire into a

6            physician's physical and mental

7            fitness and ability to practice

8            medicine with reasonable skill and

9            safety to patients."

10              Let the record reflect the

11           following Board members are present

12           and will comprise the Board's Panel

13           for a Formal Hearing in this matter:

14           Dr. Amusa, Dr. Clark, Dr. Farris,

15           Dr. Burdine, Dr. Busby, and

16           Dr. Valentine.

17              Let the record further reflect

18           that Dr. Hunter and his counsel are

19           present and the Board counsel is

20           present.

21              Counsel, please state your name

22           for the record.

23  MR. TAYLOR:

24              Nelson Taylor for Dr. Hunter.

25  MR. WALL:

**Exhibit E**

1                Ralph Wall on behalf of the

2           complainant, Dr. Mouton.

3    DR. BURDINE:

4                Okay.  Let's begin.

5    MR. WALL:

6                Good afternoon, Doctors.

7           Dr. Hunter has been the subject of

8           prior Board actions.  Prior to his

9           summary suspension in May of this

10          year, which is the subject of this

11          hearing, Dr. Hunter was serving on

12          probation since 2009 primarily related

13          to substance abuse issues.

14          Previously, his license had been

15          suddenly suspended for failure to

16          attend an evaluation related to

17          allegations of substance abuse.  He

18          also very briefly had had his license

19          suspended in regard to some child

20          support issues.

21               This hearing today stems from an

22          Order of Summary Suspension issued by

23          this Board on May 30th, 2014, after

24          Dr. Hunter failed to comply with the

25          May 19th Board order for an evaluation

**Exhibit E**

1    to rule out professional sexual

2    misconduct.  The issue before the

3    Board today is not whether Dr. Hunter

4    committed this allegation of

5    professional sexual misconduct but

6    it's whether or not he violated the

7    Board's order requiring him to attend

8    an evaluation.

9         You're being specifically asked

10   to consider whether Dr. Hunter

11   violated the Medical Practice Act by

12   failing to comply with the

13   Board-ordered evaluation.  We'll

14   demonstrate through documents and

15   testimony that Board investigative

16   personnel involved themselves with the

17   complaint made by a patient, that they

18   evaluated the patient's complaint,

19   found the patient to be truthful and

20   honest and without any particular

21   motivations.  They will also testify

22   about some history of some other

23   issues that Dr. Hunter had in relation

24   to his professional boundary

25   violations, and then ultimately it was

1    recommended to Dr. Hunter to undergo

2    an evaluation.  You'll also hear

3    testimony that he, at one point,

4    agreed to undergo the evaluation, made

5    arrangements to start down that path,

6    and ultimately did not attend the

7    evaluation.

8         You know, the issue of finances

9    is going to come up in this case.

10   Dr. Hunter, I believe, is going to

11   suggest that he simply does not have

12   the money to undergo the evaluation.

13   And I will submit to you that

14   financial concerns cannot be a

15   motivator when we're dealing with the

16   potential safety of patients.  And,

17   again, we're not going to ask you to

18   make the decision today as to whether

19   or not Dr. Hunter did in fact involve

20   himself or engage himself in

21   professional sexual misconduct.

22   Simply, the question is:  Was the

23   Board investigative personnel doing

24   the appropriate and prudent thing when

25   they asked for an evaluation, and then

**Exhibit E**

1          when Dr. Hunter failed to comply with

2          that request that this Board ordered,

3          in fact, that he undergo an

4          evaluation, and that he ultimately did

5          not and has not, as of today, gone

6          through the evaluation.  That's simply

7          what's here before us today.

8                 And, you know, maybe down the

9          road at some point you'll have to

10          weigh into the issue of this

11          particular incident and whether or not

12          it does involve sexual misconduct, but

13          you are going to be asked to consider

14          whether there was sufficient

15          information given to Board personnel

16          to take the course of action that they

17          did.  And I believe that at the end of

18          the day you'll ultimately conclude

19          that the personnel did the right

20          thing, this Board's orders should have

21          been followed, and failure to do that

22          by Dr. Hunter's account, regardless of

23          what the reasons are, is not to be

24          accepted.  Thank you.

25    JUDGE ELLIS:

1              Mr. Taylor?

2      MR. TAYLOR:

3              It is not that simple.

4      Dr. Hunter has not refused to do

5      anything.  And there is a financial

6      consideration.  And what we ask this

7      Board to look at is the process and

8      procedure by which we get to where we

9      are at this point.  We would suggest

10     that it is almost impossible under the

11     facts of this particular case for you

12     not to look at whether or not there is

13     substance to the allegations against

14     Dr. Hunter.  We suggest that there is

15     inadequate investigation, there is

16     inadequate facts upon which to order

17     what has been ordered, that it is

18     unfair that Dr. Hunter has been

19     accused.  He has had no opportunity to

20     defend himself.  He has no opportunity

21     to confront his accuser.  He has had

22     no opportunity to present evidence.

23     He has not been interviewed himself.

24     The medical records of that patient

25     have not been reviewed.  None of this

**Exhibit E**

1   has happened.  It is, in my view,

2   amazing that a mere allegation can put

3   you in a position where you are

4   imposed upon to spend thousands of

5   dollars and perhaps subjected even

6   more without an investigation that

7   would justify that.

8        What is before us is a patient

9   who for a very short time went before

10  Dr. Hunter.  Dr. Hunter adamantly

11  denies that he has done anything that

12  would violate the code of his practice

13  toward that patient.  This patient

14  submitted a complaint that obviously

15  they got off the Internet.  Part of

16  the complaint comes off the Internet.

17  There's a history to that.  And I

18  don't think that the investigator

19  knows what that history is, where that

20  complaint comes from, what's behind

21  that Internet complaint.  I would

22  suggest to you that Dr. Hunter is

23  targeted.  He has had difficulties,

24  and because of those difficulties he's

25  become a target, and he became a

**Exhibit E**

1    target.  And the patient obviously

2    knew about his prior difficulties and

3    targeted him.  We would suggest also

4    that -- what we suggested is that

5    there are less drastic things.

6         Dr. Hunter is under a

7    Physician's Health Program, and he

8    successfully -- no doubt he's had

9    problems.  He's successful for four

10   and a half years, went through that

11   program, cooperated to get his life

12   back in order.  He moved from Houma to

13   Lafayette, restoring his practice.

14   That's hard, financially difficult.

15   He was doing that.  After four and a

16   half years, somebody hits him.  And

17   all of a sudden he has to deal with

18   this.

19        What we would show, it's just

20   not fair, and that there are facts and

21   circumstances that you ought to

22   consider, that there is a lesser thing

23   that can be done.  Even if there's

24   concern, there's no basis for

25   concluding that patients are in

**Exhibit E**

1    danger.  Dr. Hunter is not a threat,

2    and we ask you to look very carefully

3    at this.  I know it's an uphill

4    battle, because the standards are so

5    high.  I think that -- I'm not afraid

6    of those standards.  I ask you to just

7    look carefully at the facts.  This is

8    a physician who deserves -- we're not

9    trying to avoid the standard.  He

10   doesn't have the money for this

11   program.  And I, of course, join, just

12   because you don't have money and there

13   is wrongdoing, does not alleviate,

14   that shouldn't be a problem.  But if

15   there is not an adequate basis for

16   investigation to put you in the

17   position that you're in and there is

18   not really a danger, I think you ought

19   to look at that.  Thank you.

20  MR. WALL:

21       The evidence that I will submit

22   today include Exhibit A and 1 through

23   11.  I've passed out the documents.

24   These consist of Board records.  There

25   is a certification indicating that

**Exhibit E**

1          these are records of the Board, and I

2          will offer file and introduce

3          Exhibit A and Exhibit 1 through 11

4          as -- the Board can take recognition

5          of its own records as evidence in this

6          matter.

7    JUDGE ELLIS:

8               Any objection?

9    MR. TAYLOR:

10              No objection.

11   JUDGE ELLIS:

12              All right.  Will be admitted.

13   MR. WALL:

14              My first witness is Lesley Rye.

15         (At this time, **LESLEY R. RYE, RN, MSN,**

16         was duly sworn in by Dr. Farris.)

17         **D I R E C T   E X A M I N A T I O N**

18   BY MR. WALL:

19      Q.   And, Ms. Rye, I'll remind you that

20   although I'm asking you the questions and

21   you'll probably be looking at me, if you'll

22   answer to the Board, because they're the ones

23   that need to hear the information.

24      A.   Correct.

25      Q.   Would you please state your name and

1    address, please?

2        A.    Leslie R. Rye, 630 Camp Street, New

3    Orleans.

4        Q.    And what is your occupation?

5        A.    I'm an investigator and a compliance

6    officer with the Louisiana Medical Board.

7        Q.    Would you describe for me what a

8    compliance officer does for the Board?

9        A.    As the compliance officer, we are the

10   individuals in the office that are assigned

11   cases that are required to be monitored by the

12   Board either through consent orders or Board

13   decisions.  So my job, or my role, is to

14   monitor to make sure the licensee is compliant

15   with their order.

16       Q.    Was Dr. Hunter one of the physicians

17   that you monitored in your role as a

18   compliance officer?

19       A.    Yes, he was.

20       Q.    If you don't mind, I'm going to

21   approach the witness and provide you a copy of

22   the documents that we've submitted into

23   evidence, and ask you to turn your attention

24   to Exhibit Number 4.  I'll ask you to take a

25   look at that document entitled "Consent Order

**Exhibit E**

1    for Reinstatement of License on Probation."

2    Was that the consent order that Dr. Hunter was

3    presently serving under?

4         A.   (Reviews document.)

5              Yes.

6         Q.   At some point, did you receive a

7    complaint from someone who claimed to be a

8    patient of Dr. Hunter?

9         A.   Yes, I did.

10        Q.   And I will ask you to take a look at

11   Exhibit 6 and ask whether that is the

12   complaint that you received?

13        A.   (Reviews document.)

14             Yes, it is.

15        Q.   And the complaint consists of a Board

16   form that the patient signs; is that correct?

17        A.   Correct.

18        Q.   Although her full name is in this

19   complaint, I'm going to refer to her in the

20   record as "A.B.."  So AB's complaint included

21   the one-page form as well as a page of

22   narrative; is that correct?

23        A.   Correct.

24        Q.   Also included are some other

25   attachments that she represented to be

1    documents she obtained through this Internet;

2    is that correct?

3         A.   Correct.

4         Q.   All right.  Of this information, what

5    was of particular concern to you once you

6    received this complaint?

7         A.   Concern to me was the fact that this

8    was a patient of Dr. Hunter's who had seen him

9    for four visits, and she indicated that in all

10   of those visits there was inappropriate

11   comments made and that she was -- felt to be

12   very uncomfortable in her sessions with

13   Dr. Hunter.

14        Q.   In your capacity as a compliance

15   officer and investigator of the Board, do you

16   involve yourself in investigations similar to

17   this?

18        A.   Yes, I do.

19        Q.   All right.  Tell us what you did in

20   this particular case after receiving the

21   complaint.

22        A.   Well, a couple of things.  When we

23   have a complaint that comes in like this, we

24   open it up as a new complaint, and I also

25   review it with the director of

1   investigations.  But I also make contact with

2   the individual that has written the complaint,

3   and so I did a phone interview with Miss A.B..

4        Q.   Tell me what you learned about patient

5   A.B..

6        A.   Well, in the phone interview with

7   Miss A.B., I learned that she indeed had those

8   sessions and she was able to articulate what

9   she had written.  She expressed that she was

10  very uncomfortable from the get-go, but she

11  continued to see Dr. Hunter in the hopes that

12  he could help her.  He was referred to her by

13  her insurance company, and she had hopes that

14  she'd be able to get some of her underlying

15  concerns taken care of.

16       Q.   I'm going to ask you to take a look at

17  page 2 of Exhibit 6.  And, certainly, the

18  Board can read her statements that she made in

19  her complaint.  But I want to focus on a few

20  statements contained in a couple of these

21  visits.  First one is of February 6th, 2014,

22  which was her first visit; is that correct?

23       A.   Correct.

24       Q.   All right.  And at that point, did she

25  relate to you that he made a comment about

1    whether or not she had had a boob job?

2        A.   Yes.  She indicated that sort of

3    towards the end of the appointment he looked

4    down her shirt and asked her had she had a

5    boob job, and wondered why she didn't put that

6    on her medical information sheet.  She said

7    she felt very uncomfortable and didn't

8    understand why he was, you know, asking her

9    that.

10       Q.   Did A.B. discuss with you at all why

11   she returned to see Dr. Hunter after that

12   first encounter?

13       A.   Yes.  She initially went because she

14   had anxiety issues.  She was having difficulty

15   sleeping.  She was preparing for an upcoming

16   wedding and was getting more anxious about her

17   wedding.  She said she felt uncomfortable

18   after the first session, but she was used to

19   working with male employees, she works in the

20   sheriff's department.  She said she just took

21   it as, ah, you know, he's just being a guy,

22   just kind of wrote it off.  And said that she

23   was -- made the next appointment, went to the

24   next appointment still in hope that he might

25   be able to assist her with some of her anxiety

**Exhibit E**

1   issues.

2       Q.    I want to direct your attention to the

3   last sentence of the February 12th, 2014

4   note.  And everybody can see that statement.

5   Did she relate to you that that statement was,

6   in fact, made to her by Dr. Hunter?

7       A.    Yes, she did.  She said he made a lot

8   of focus on her fiancé and her sex life, and

9   then indicated the comment that -- that's

10  listed there.

11      Q.    She did subsequently return to him,

12  though, did she not?

13      A.    Yes, she did, on February 26th.

14      Q.    And at that point did she relate to

15  you further discussion taking place with

16  Dr. Hunter regarding her sex life?

17      A.    Correct.  She went in again

18  complaining of some of the symptoms that she

19  had.  She felt that the medication that she

20  was put on was not working.  She claims, and

21  told me on the phone, that he didn't want to

22  hear any of that, that he wanted again to

23  focus on, she felt, her image and what she

24  looked like, telling her that she was gaining

25  weight in all the right places, again brought

1    up her sex life, and seemed to want to discuss

2    that further with her.

3        Q.   Now, as part of your job as an

4    investigator, do you attempt to evaluate the

5    truthfulness and the motivations behind a

6    complaint?

7        A.   Yes.

8        Q.   In this particular case, did you have

9    any indication, develop any concern about

10   whether or not this patient was being truthful

11   about the allegations she was making?

12       A.   I always try to figure out when I get

13   these kind of complaints what's the

14   motivation, where is it coming from, why

15   they're continuing to see the physician if

16   they're uncomfortable the first time.  So a

17   lot of my questioning does have to do into the

18   specifics of the appointments, trying to see

19   if their stories change, trying to see if

20   there's anything else out there that they are

21   hunting for, whether they bring up that, you

22   know, there's a civil suit or money they're

23   after or anything.  And from the questioning I

24   gave with her and her statements, I felt her

25   to be credible.

**Exhibit E**

1       Q.    Now, in addition to her statement,

2   there were some notes, some Internet

3   blogging -- I don't know what you're going to

4   call it -- that she also attached; is that

5   true?

6       A.    Correct.

7       Q.    Now, did you provide any particular

8   weight at all to these statements contained on

9   whatever this website was from?

10      A.    I always look at everything they

11  present to us in a complaint.  And, you know,

12  I was curious by this and obviously looked

13  through it as well.  Honestly, I had seen some

14  of this already before that had been posted on

15  the website up to a certain date, I guess the

16  last time someone had brought this to our

17  attention.  So in terms of do I -- your

18  question was:  Do I put a lot of weight on

19  this?

20      Q.    Sure.

21      A.    That was your question?

22      Q.    Yes.

23      A.    Not really.  I mean, I take it

24  altogether.  This alone would not have weighed

25  any more.  This did not add more to the

**Exhibit E**

1   written complain prior.

2        Q.   Now, the information, the article, if

3   you will, on the last two pages of Exhibit 6

4   in regard to allegations involving a lawsuit

5   that Dr. Hunter was involved in, was this the

6   first time you'd seen information regarding

7   these types of allegations?

8        A.   No, this was not the first time.

9        Q.   All right.  I want to direct your

10  attention now to Exhibit 12, which is the PHP

11  Monitoring Contract.  In your job as a

12  compliance officer, when a physician is on a

13  consent order or on probation, is part of what

14  you do involving yourself with making sure he

15  complies with the PHP contracts?

16       A.   (Reviews document.)

17            Yes.

18       Q.   All right.  And, in general, this

19  particular contract for Dr. Hunter, which was

20  signed in 2009, involved what?

21       A.   This contract was initiated -- or for

22  the time period October '09 to October 2014.

23  It actually was about the same time as the

24  consent order he was under.  It was initiated

25  due to a return to use.  He was being

1    monitored by the PHP with this contract.  It

2    had the standard language of a PHP contract

3    except for the second to last other

4    requirement.

5        Q.    I want to direct your attention to

6    that.  Would you read into the record that

7    other requirement that's contained on page 5

8    of 6?

9        A.    Yes.  The other requirement on this

10   contract was:  Prior to returning to the

11   practice of medicine, Dr. Hunter agreed to

12   complete a treatment process focusing on

13   professional boundaries that is approved by

14   the PHFL PHP.

15       Q.    Now, a professional boundary

16   requirement is not something that is

17   specifically related to other substance abuse

18   issues, is it?

19       A.    No.

20       Q.    And would you tell the Board what

21   knowledge was developed at the time that this

22   PHP monitoring contract was entered into that

23   triggered that additional requirement?

24       A.    Dr. Hunter had had a return to use

25   somewhere around 2008, and that's what led to

**Exhibit E**

1    the consent order as well as his PHP
2    contract.  Prior to this contract, he had had
3    treatment -- first evaluation and then
4    subsequent treatment at Pine Grove.  And the
5    recommendation following his treatment at Pine
6    Grove was a summary -- discharge, excuse me,
7    summary recommendation which was exactly this
8    language.  So his treating professionals had
9    stated that prior to his returning to the
10   practice of medicine he was to complete this
11   treatment process focusing on professional
12   boundaries.
13       Q.   What information was contained in the
14   Board file in regard to the reason why this
15   particular clause was included?
16       A.   A couple of things.  While he was at
17   Pine Grove, they did find some pornographic
18   material in his vehicle and did put him into a
19   sexual men's group, or Next Step, I think is
20   what they call it, men's group while he was on
21   site there for treatment.  Also, around this
22   time, the Board learned that Dr. Hunter was in
23   the midst of a civil lawsuit regarding his
24   having had a relationship with a female
25   patient, a sexual romantic relationship.  So

1  both of those issues factored into this

2  recommendation.

3       Q.   Now, after 2009 when this PHP contract

4  was entered into and a consent order was

5  entered into, did the Board investigative

6  personnel obtain additional information

7  regarding the lawsuit at issue with

8  Dr. Hunter?

9       A.   Yes.   Around 2013, probably about a

10  year ago when we got this complaint, a year

11  prior, so somewhere around March 2013, we

12  received a call from a female who stated that

13  she had had a civil lawsuit that had just

14  settled regarding a romantic relationship that

15  she had had with Dr. Hunter.   It had happened

16  10 years prior.   She was not allowed at the

17  time to discuss it with anyone.   But as part

18  of her healing process, she was calling us

19  then because she wanted to make us aware of

20  it.

21       Q.   And what resulted from that

22  communication?

23       A.   Well, after I received the call, I

24  went to discuss it with the director of

25  investigations, and we were aware that this

**Exhibit E**

1    was in the history and felt that it had been

2    dealt with, with the contract and the order.

3    So, at the time, it was decided -- what I was

4    instructed to do, and what I did do, was

5    advise this complainant that it had been a

6    period of 10 years, and although we had no

7    statute of limitations, that the Board may not

8    be in a position to take formal action related

9    to something that happened 10 years prior, but

10   if she would submit it to us in writing, that

11   we would address it with Dr. Hunter.  And our

12   plan at that time was to, at that time, bring

13   it to his attention, have him respond, and see

14   if we needed to go further with maybe an

15   evaluation or polygraph at that time.  This

16   complainant did not submit it in writing.

17        Q.   All right.  So at the time that A.B.

18   submitted the complaint to the Board in March

19   of 2014, the Board had not only AB's

20   complaint, but also had this prior history

21   with Dr. Hunter; is that correct?

22        A.   Correct.

23        Q.   All right.  From that, what did you do

24   next?

25        A.   Well, after receiving this new

**Exhibit E**

1   complaint, we brought it to the direct -- I

2   brought it to the director of investigations,

3   and we wrote a letter to Dr. Hunter with a

4   copy of the complaint.

5        Q.   Now, I will refer you to Exhibit 5 in

6   the booklet and ask if that's the letter that

7   was written?

8        A.   (Reviews document)

9             Yes.

10       Q.   And the request was for Dr. Hunter to

11  voluntarily go to BMI to be evaluated; is that

12  correct?

13       A.   Yes.

14       Q.   Did you hear back from Dr. Hunter

15  after receiving this letter?

16       A.   I did.

17       Q.   And tell the Board what occurred after

18  receiving the letter.

19       A.   I heard back from Dr. Hunter.  He did

20  respond with his narrative to the complaint.

21       Q.   Now, I'll direct your attention to

22  Exhibit Number 7, and ask if that's your

23  understanding of the response to the

24  complaint?

25       A.   (Reviews document.)

**Exhibit E**

1          Yes.

2      Q.   And if you would, just kind of

3   generally summarize what Dr. Hunter's position

4   was relative to the complaint.

5      A.   Well, Dr. Hunter presented the

6   complainant as -- he did not believe that she

7   was being truthful and that she was

8   misconstruing some of his comments.  So he

9   went through each of the visits and put what

10  he remembered saying and why he focused on

11  certain things such as body image that might

12  have distorted -- he felt she distorted what

13  he meant.  He also went on to say that he did

14  not feel like he needed an evaluation.

15  And although initially he had said verbally to

16  me BMI would be something he'd consider, he

17  said he had real reservations at this point of

18  going to BMI.

19     Q.   In addition to his letter, did

20  Dr. Hunter provide some additional documents

21  with his letter?

22     A.   He did.  He sent what looked like an

23  Internet news report regarding the Lafayette

24  Parish Correctional Center and some misdoings

25  that had occurred at that facility.

1      Q.   And AB's name is not mentioned in this

2   Internet report at all, is it?

3      A.   I could not find it, no.

4      Q.   Or any information that would suggest

5   that A.B. was involved and whatever that

6   particular investigation involved; is that

7   true?

8      A.   Yeah.  Correct.

9      Q.   So what happened after receiving

10  Dr. Hunter's information?

11     A.   At that point, we discussed with

12  Dr. Hunter about if he could recommend another

13  Board-approved facility that he was willing to

14  attend for an evaluation, that we would be

15  okay with that, and it did not need to be BMI.

16     Q.   Did you write to Dr. Hunter again?

17  And I'll ask you to take a look at Exhibit

18  Number 8.

19     A.   I did, on April 10th, 2014.

20     Q.   At this point, on April 10th, 2014, it

21  was your feeling that he needed to go forward

22  with an evaluation, correct?

23     A.   Correct.

24     Q.   And in addition to this

25  correspondence, did you have discussions,

**Exhibit E**

1     telephone discussions, with Dr. Hunter?

2          A.   I did.

3          Q.   Would you generally relate to the

4     Board your discussions between this April 10th

5     date and later into May?

6          A.   Later into May.  Yes.  This letter --

7     Dr. Hunter requested a meeting to discuss the

8     evaluation, and this letter was directing him

9     that a meeting was not necessary at this

10    point, that the evaluation needed to be

11    completed.  I then heard from Dr. Hunter that

12    BMI was an issue for him and could he consider

13    ACUMEN.  So we advised him that he could go to

14    ACUMEN instead of BMI.  And he indicated that

15    he had it scheduled -- and he did this through

16    phone and e-mail -- that he had scheduled the

17    pre-eval phone meeting that occurs at ACUMEN

18    before you go in for the evaluation.  So he

19    scheduled that, he did complete that, and --

20    keep going?

21         Q.   Yes, please.

22         A.   All right.  And then he indicated at

23    one point after he had finished the phone -

24    the pre-phone -- I'm sorry, the phone

25    evaluation, after he completed that, he

**Exhibit E**

1    indicated he was going to set up and schedule
2    the evaluation at ACUMEN.  The next
3    information I got from him was that he was
4    trying to get a loan in order to set up that
5    evaluation.  And then about maybe a week to 10
6    days went by, and I had not heard from him,
7    and I called ACUMEN to verify whether or not
8    the evaluation had been scheduled and was told
9    that it had not.
10        Q.   Now, tell the Board typically what
11   happens when you have a case where you feel
12   like there is a need for evaluation, what do
13   you usually instruct the physician in regard
14   to practice?
15        A.   Usually, if we have a concern about
16   patient safety, particularly in a boundary or
17   sexual misconduct situation, the physician is
18   advised to stop practice until they get the
19   evaluation.  In this case, we had indicated to
20   Dr. Hunter that, as he had a monitor in place,
21   if he could assure us that his monitor was
22   going to be aware of this evaluation and aware
23   of our concerns and could satisfy to us that
24   he would be monitoring him that we would allow
25   him to continue to practice until the

**Exhibit E**

1    evaluation was complete.

2        Q.   This discussion that you had with

3    Dr. Hunter about monitoring, did it involve

4    this as a long-term alternative to an

5    evaluation?

6        A.   No.  It was short-term until the

7    evaluation could be completed.

8        Q.   Prior to May 19th of 2014, did you

9    become aware of whether or not Dr. Hunter did

10   in fact attend an evaluation?

11       A.   He had not attended an evaluation.

12       Q.   All right.  As of May 19th, what

13   happened after that?

14       A.   Because he had not completed or had

15   scheduled or shown up for his evaluation, that

16   information was brought to the director.  And

17   at that point, the next step is to do a sick

18   physician order which would order the

19   physician to the evaluation.

20       Q.   I'm going to show you a copy of

21   Exhibit 10, which is a correspondence and some

22   attachments and ask you whether or not this

23   was the Order for Evaluation entered on May

24   19th, 2014?

25       A.   (Reviews document.)

**Exhibit E**

1          Yes.  This is the sick -- what we call

2     the Sick Physician Statute, the order.

3          Q.   After receiving that order, did you

4     receive any further communications from

5     Dr. Hunter?

6          A.   I believe I did receive some

7     information from him, and a letter was sent by

8     him saying that he could not afford the

9     evaluation.

10         Q.   I want to ask you to turn your

11    attention to Exhibit Number 11, and ask if

12    that's the letter that you're referencing?

13         A.   (Reviews document.)

14              Yes, that is.

15         Q.   What happened after that?

16         A.   After we received this letter, which

17    indicated that Dr. Hunter was not willing to

18    complete the evaluation, that information was

19    brought to the director, and at that point the

20    next step was the summary suspension.

21         Q.   And I'm going to direct your attention

22    to Exhibit 3.  Is that the notice to

23    Dr. Hunter and the summary suspension issued

24    on May 30th, 2014?

25         A.   (Reviews document.)

**Exhibit E**

1          Yes, it is.

2     Q.    Would monitoring of a physician be a

3   substitute for an evaluation?

4     A.    No.

5     Q.    Why is that?

6     A.    When we get a complaint on a sexual

7   misconduct or a boundary -- possible boundary

8   violation, it's not for the investigator or

9   the compliance officer to determine whether

10  that information is accurate or not.  The best

11  way for us to determine if this licensee is

12  safe to practice -- particularly in a

13  psychiatrist's situation where it's usually a

14  one-to-one and you don't have supporting staff

15  that are close by, the best way for us to

16  determine safety to practice is for them to

17  get an evaluation and let the experts in

18  sexual misconduct make that determination.

19     Q.    In this particular case, the agreement

20  to allow Dr. Wortham to serve as a monitor

21  temporarily, did you appreciate that

22  Dr. Wortham would be sitting in every single

23  patient encounter Dr. Hunter was going to

24  have?

25     A.    No.  In fact, I did not appreciate

 1    that that could easily happen in a

 2    psychiatrist's practice.  What Dr. Wortham

 3    supplied to us was that he would do his best

 4    to make sure that he was next door in the

 5    sessions, that he was always there when

 6    patients were around, that the receptionist

 7    that was present would also be aware of this,

 8    and that they would be as vigilant as they

 9    could to be sensitive to any issues with

10    female patients that might come up.

11        Q.   In the end, would monitoring be able

12    to assist you in determining whether or not

13    Dr. Hunter had issues with boundaries?

14        A.   No.

15    MR. WALL:

16               That's all the questions I

17           have.  Thank you.

18    JUDGE ELLIS:

19               Cross-examine?

20    MR. TAYLOR:

21               Sir?

22    JUDGE ELLIS:

23               You want to cross-examine the

24           witness?

25    MR. TAYLOR:

**Exhibit E**

1            Yes, sir.

2        C R O S S - E X A M I N A T I O N

3    BY MR. TAYLOR:

4        Q.   Ms. Rye, are you suggesting that in

5    boundaries or sexual misconduct that there is

6    a presumption of guilt of a physician from the

7    beginning?

8        A.   No.

9        Q.   What are you suggesting?

10       A.   I'm suggesting that when I have or

11   when we have an allegation -- and in a lot of

12   these situations, it is a he-say, she-say

13   situation, and we have a prior history, that I

14   am not the one that really can determine if

15   they're guilty or not, that I need an expert,

16   an evaluation to make that determination.

17       Q.   You say prior history.  What prior

18   history are you talking about?

19       A.   I'm talking about the history of the

20   recommendation that came out of Pine Grove and

21   the civil suit.

22       Q.   The civil suit.  Did you investigate

23   that civil suit?

24       A.   No, sir.

25       Q.   Did you know what the allegations

**Exhibit E**

1    were?

2        A.    Not -- no, sir.

3        Q.    Do you even know what it was about?

4        A.    Yes, sir.

5        Q.    What was it about?

6        A.    It was about a female psychiatric

7    patient that had a romantic sexual

8    relationship with Dr. Hunter.

9        Q.    Did you know if that's true or not?

10       A.    Do I know if it's true or not?

11       Q.    Yes.

12       A.    No.  No.

13       Q.    Did you investigate that?

14       A.    No.

15       Q.    If I were to tell you that that case

16   is still pending and that that particular

17   person has been accused of extortion, would

18   you know anything about that?

19       A.    No.

20       Q.    Have you looked at that case file?

21       A.    No.

22       Q.    Can you verify anything about the

23   truth and voracity of those claims?

24       A.    No.

25       Q.    With regard to the current claim, did

**Exhibit E**

1   you interview the alleged victim?

2        A.    Yes.

3        Q.    How many times?

4        A.    Three times.

5        Q.    Three times?

6        A.    Uh-huh (affirmative response).

7        Q.    Did you take notes of your interviews?

8        A.    Two of the three.

9        Q.    You took notes two or three times?

10       A.    Two of the three.  Twice.

11       Q.    You took notes twice?

12       A.    Correct.

13       Q.    Do you have those notes with you?

14       A.    Not in this room.

15       Q.    Can you produce those notes for this

16   panel?

17   MR. WALL:

18                I'm going to enter an objection

19            in regard to requests for production.

20            We're here in a hearing today.  The

21            issues of whether these notes are and

22            ultimately whether those are going to

23            be subject of an underlying sexual

24            misconduct claim is one thing.  We're

25            here today in regard to a Board order

**Exhibit E**

1          and, therefore, it's inappropriate to

2          make this request at this late hour.

3     MR. TAYLOR:

4               I'm not making a request.

5     BY MR. TAYLOR:

6          Q.   I'm asking you, will those notes be

7     available to this Board at any time?

8          A.   Yes, sir.

9          Q.   Okay.  You interviewed her three

10    times.  Can you tell me when you interviewed

11    her with respect to her complaint?

12         A.   I'd have to look at my notes for the

13    dates.  But I interviewed her by phone the --

14    right after receiving the complaint.  I

15    interviewed her with Mr. Wall on this week --

16    no, I'm sorry.  Today's Monday.  Last week.

17         Q.   Last week?

18         A.   Last week.

19         Q.   When was the other time you

20    interviewed her?

21         A.   The third time was a review today.

22         Q.   Today?

23         A.   Today.

24         Q.   Did you at any time attempt to talk to

25    Dr. Hunter about this complaint?

**Exhibit E**

1       A.    To talk about -- we talked about --

2       Q.    The allegations against him.

3       A.    Well, ask me the question again.  I'm

4    sorry.

5       Q.    Did you at any time attempt to talk to

6    Dr. Hunter about these allegations against

7    him?

8       A.    We talked a lot of times.  Did we go

9    through each point of the allegation?  No.

10      Q.    Did you at any time talk about the

11   specific allegations of this complaint with

12   Dr. Hunter?

13      A.    I don't think we got into the details

14   of it, so I'd have to say no.

15      Q.    Did you think it important to hear

16   what he had to say?

17      A.    Yes.

18      Q.    Why didn't you ask him about these

19   complaints?

20      A.    Because the process is for him to

21   write a response to the complaint.  So he was

22   sent the complaint, and then he wrote his

23   response to the complaint.

24      Q.    You didn't ask him to write a

25   response, did you?

1      A.   Can you ask me that again?

2      Q.   You did not ask him to give a response

3  before you entered your findings for him to go

4  do an evaluation?

5      A.   No.  No, you're right.  The letter

6  went to him with the complaint, with the

7  response, with the directive at that point to

8  go to BMI, correct.

9      Q.   So you had already made up your mind

10  without ever talking to him?

11      A.   The decision was made for an

12  evaluation, yes.

13      Q.   And that was based upon what?

14      A.   That was based upon the complaint

15  received, the interview of the complainant,

16  the previous information we had on Dr. Hunter,

17  the recommendations from Pine Grove.

18      Q.   What previous information on

19  Dr. Hunter?

20  MR. WALL:

21               Object, asked and answered.

22          She's already testified.

23  JUDGE ELLIS:

24               Well, I know she's testified to

25          it, but I think in this context she

**Exhibit E**

1          can say it again.  I'll let her

2          answer.

3  BY MR. TAYLOR:

4      Q.   Was the previous information the

5  Dionne (assumed spelling) complaint?  Do you

6  know the name "Dionne"?

7      A.   Yes.  Yes, sir.

8      Q.   Was it that complaint that you have

9  not seen?

10     A.   The previous information was the

11  evaluation from Pine Grove which found the

12  pornography in his vehicle and placed him in

13  the sexual men's group at Pine Grove, the

14  discharge summary from Pine Grove that

15  recommended that he go have a treatment

16  process on sexual boundaries before he

17  returned to practice.  And the other

18  information was the information that was sent

19  to us or given to us regarding the civil suit.

20     Q.   The other information regarding the

21  civil suit.  What information did you have

22  regarding that suit?

23     A.   We have a -- we have documents that

24  were presented to us regarding the civil suit.

25     Q.   Do you know if that civil suit is

1   still open?

2   MR. WALL:

3               Objection, asked and answered.

4          He's already asked the question.

5   JUDGE ELLIS:

6               The question was, do you have --

7          what's the question?

8   BY MR. TAYLOR:

9      Q.   Do you know if -- have you looked at

10  that record of that civil suit to know that

11  it's still open?

12  JUDGE ELLIS:

13              We already know she hadn't

14              looked at that record.  She's not

15              going to answer that anymore.

16  MR. TAYLOR:

17              Okay.

18  BY MR. TAYLOR:

19     Q.   With respect to pornography, when was

20  this pornography at Pine Grove?

21  MR. WALL:

22              Objection, asked and answered.

23          She's already testified about this.

24  MR. TAYLOR:

25              No, she hasn't.

**Exhibit E**

1   MR. WALL:

2           She absolutely did.  She

3           testified it was in his car.

4   JUDGE ELLIS:

5           Wait just a minute.  Don't

6           you-all talk to each other.  You know

7           better than that.  The question was:

8           When was this pornography?  She has

9           not answered that.

10  MR. WALL:

11          All right.  Fair enough.

12  BY MR. TAYLOR:

13      Q.   When?  When?

14      A.   The information from Pine Grove was in

15  the evaluation, and the evaluation indicated

16  that pornography was in the vehicle of

17  Dr. Hunter while he was --

18  JUDGE ELLIS:

19          When was that, Ms. Rye?

20  THE WITNESS:

21          The evaluation was somewhere in

22          two thousand -- end of 2008, early

23          2009.

24  JUDGE ELLIS:

25          So that would be the time --

**Exhibit E**

1   THE WITNESS:

2                   Prior to the consent order,

3             prior to the PHP contract.

4   JUDGE ELLIS:

5                   2008, 2009 was the time upon

6             when it was discovered.  Okay.

7   BY MR. TAYLOR:

8       Q.   And that was addressed by the PHP

9   order; was it not?

10      A.   There was -- it was a PHP

11  recommendation in the contract that came from

12  the Pine Grove discharge summary.

13      Q.   Now, I assume that had absolutely

14  nothing to do with patients?

15      A.   Is that a question?

16      Q.   Yes.

17      A.   You're asking did it have anything to

18  do with patients?

19      Q.   Yes.

20      A.   I don't know.  I don't know.

21      Q.   You don't know?

22      A.   No.

23      Q.   Was it reported to have anything to do

24  with patients?

25      A.   I'm not sure how to answer that.

**Exhibit E**

1    Patients, you mean his patient relationships?

2         Q.   Yes.

3         A.   No.

4         Q.   Now, how did you relate it to the

5    current allegations?

6         A.   I related it as a boundary issue.

7         Q.   A boundary with respect to who?

8         A.   When -- I don't know if I can answer

9    that yes or no.  You want me just to give you

10   my thought?

11   JUDGE ELLIS:

12                Give him the best answer you can

13            give him, Ms. Rye.

14   THE WITNESS:

15                Okay.  When a licensee is being

16            evaluated at a treatment center and

17            they look at all aspects, including

18            sexual history, physical history,

19            psychological, psychiatric, and the

20            treatment team has a concern with

21            something that's been found on the

22            physician relating to sexual

23            misconduct, and they put it in the

24            discharge summary as before he can

25            return to practice he needs to have

**Exhibit E**

1          treatment in professional boundaries,

2          then I equated that there were some

3          boundary issues.

4    BY MR. TAYLOR:

5      Q.   Now, in discussing Dr. Hunter's May

6    27th, 2014 letter, which I think is Exhibit

7    Number 11, you appear to indicate that

8    Dr. Hunter refused to attend evaluation by

9    this letter.  Is that your evaluation of that

10   letter?

11   MR. WALL:

12          I'm going to object to any

13          questioning about the letter.  The

14          letter is -- the contents of the

15          letter is what it is.  Therefore, the

16          Board is free to read it, make its own

17          interpretation about what the letter

18          says.

19   MR. TAYLOR:

20          I understand.  But she

21          interpreted the letter to the Board.

22   JUDGE ELLIS:

23          All right.

24   MR. TAYLOR:

25          And I'm asking her is that a

1            fair interpretation of that letter
2            that she gave to the Board.
3   BY MR. TAYLOR:
4       Q.   Is that a refusal to attend
5   evaluation?
6       A.   I took it -- yes, if you want a
7   yes/no.
8       Q.   Doesn't that letter tell you that
9   after going through the process he discovers
10  that it costs more than $7,000 that he doesn't
11  have?
12  MR. WALL:
13            I'm going to enter an objection
14            into any further questioning about the
15            letter.  He asked the question about
16            what the interpretation was; she gave
17            it.  Any further discussion about this
18            letter, the Board is free to
19            understand it itself.
20  JUDGE ELLIS:
21            They can discuss the letter, all
22            right.  But I don't think there's any
23            point in asking her to repeat the
24            contents.
25  MR. TAYLOR:

**Exhibit E**

1                All right.

2    BY MR. TAYLOR:

3        Q.   Did you understand that Dr. Hunter had

4    attempted to borrow money?  Did he communicate

5    that to you?

6        A.   Yes.

7        Q.   And that he was unsuccessful in doing

8    that?

9        A.   Yes.

10       Q.   Now, you said that with respect to

11   this prior complaint that you gave Ms. Dionne

12   an opportunity to submit something in writing,

13   and she submitted nothing; is that correct?

14       A.   Yes.

15       Q.   Now, with respect to Dr. Hunter's

16   continuation in practice while he was

17   attempting to make arrangements for the

18   evaluation, I assume that was allowed for how

19   long?

20       A.   The arrangement of monitoring with

21   Dr. Wortham?

22       Q.   Yeah.

23       A.   It was approved until he could get the

24   evaluation done initially, I believe when we

25   were aware of his cooperation to go to BMI.

**Exhibit E**

1      Q.   How long was that?

2      A.   There was not a time frame when -- if

3    I remember correctly, when Dr. Hunter

4    indicated he would go -- well, I got to go

5    back to my notes.  I'm sorry.  Ask me the

6    question again.

7      Q.   How long -- between the time that you

8    directed Dr. Hunter to go through the

9    evaluation and his efforts to do that and your

10   letter summarily suspending his practice, how

11   long did you permit him to practice?

12     A.   I'd have to look at the time frame if

13   you want me to give you dates, but --

14     Q.   Don't you have the documents in front

15   of you?

16   MR. WALL:

17             Objection.  You're cutting off

18          the witness.  Please let her finish.

19   MR. TAYLOR:

20             Okay.

21   JUDGE ELLIS:

22             Look at the stuff in the record,

23          Ms. Rye, and tell us.  Take your time.

24   THE WITNESS:

25             When the first letter that went

1           to Dr. Hunter on March 28th, which
2           recommended he submit to an evaluation
3           at BMI and sent him a copy of the
4           complaint, at that time we did not
5           address practice.  He was to call us
6           within three business days with the
7           date and time that he was scheduled to
8           be evaluated.  So at that time nothing
9           was said about continuing to
10          practice.  When he then made contact
11          with me, and I'm not sure that that
12          date's in here, saying that he wasn't
13          sure how soon he could go, there was a
14          -- it extended the time period of what
15          was expected.  So within three days he
16          was supposed to have a date.  We
17          didn't have the date.  And it was at
18          that time that I discussed with the
19          director about continuing to
20          practice.  And it was said that if we
21          can have a good monitoring in place,
22          then he could still continue to
23          practice.  The evaluation, though,
24          kept getting pushed back.  So nothing
25          was changed, though, at that time in

**Exhibit E**

1             terms of stopping practice until the
2             time period continued to grow and
3             grow, the sick physician order was not
4             followed through on, and then the
5             summary suspension.
6    BY MR. TAYLOR:
7        Q.   Ms. Rye, how long did you permit
8    Dr. Hunter to practice?
9    MR. WALL:
10               Objection, asked and answered.
11           Ms. Rye is not the one --
12    JUDGE ELLIS:
13               Permitted him to practice from
14           March 8, 2014 to May 30, 2014.  Are
15           those the dates in here?
16    THE WITNESS:
17               Yeah, but I don't permit --
18    JUDGE ELLIS:
19               I know you don't.  But that's
20           what the records show?
21    THE WITNESS:
22               Correct.
23    JUDGE ELLIS:
24               Okay.
25    BY MR. TAYLOR:

1     Q.   Now, Ms. Rye, did you contact

2   Dr. Wortham?

3   MR. WALL:

4                   Objection, relevance.

5   JUDGE ELLIS:

6                   We don't know -- Dr. Who?

7   BY MR. TAYLOR:

8     Q.   -- Dr. Wortham about the supervision

9   during the interim of the efforts to get an

10  evaluation?

11  MR. WALL:

12                  Objection, relevance.

13  JUDGE ELLIS:

14                  Let's see.  Answer the question.

15  THE WITNESS:

16                  I had a -- I'm trying to -- I

17          had a conversation either through

18          phone or e-mail with Dr. Wortham.  I

19          can't remember if I contacted him or

20          he contacted me.

21  BY MR. TAYLOR:

22    Q.   Do you remember the substance of that

23  communication?

24  MR. WALL:

25                  Objection, relevance.

**Exhibit E**

1    JUDGE ELLIS:

2                And hearsay?

3    MR. WALL:

4                I'm okay with the hearsay.  I

5           think it's irrelevant, completely

6           irrelevant to this matter.

7    JUDGE ELLIS:

8                I don't know whether it is or

9           not, because I don't know how he's

10          going to relate it to this case yet.

11   BY MR. TAYLOR:

12       Q.   Is Dr. Wortham the person who does the

13   monitoring for Dr. Hunter under the

14   Physician's Health Program?

15       A.   Correct.  Yes.

16       Q.   And is he the person you contacted to

17   increase the monitoring during the interim of

18   Dr. Hunter's effort to get the evaluation that

19   was requested?

20       A.   Yes.

21       Q.   And you asked Dr. Wortham to do that.

22   Did Dr. Wortham communicate back to you?

23       A.   Yes.

24       Q.   Did he indicate to you that he was

25   willing to do that increased monitoring?

**Exhibit E**

1   MR. WALL:

2            Objection, relevance.

3   JUDGE ELLIS:

4            Haven't we been over this

5        before?

6   MR. TAYLOR:

7            No, sir.

8   JUDGE ELLIS:

9            And what does it have to do with

10       the case?

11  MR. TAYLOR:

12           Well, what it has to do with the

13       case, your Honor, is that I have

14       suggested one of the things about the

15       sudden taking away of the right to

16       practice is imminent danger to

17       clients.  And what I'm suggesting,

18       that in this case there is no imminent

19       danger and that they allowed him to

20       practice.

21  JUDGE ELLIS:

22           Okay.  This doesn't really prove

23       that.  I sustain the objection.

24  MR. TAYLOR:

25           With all due respect, I'd like

**Exhibit E**

1          to make an offer of proof, two

2          letters, one from Dr. --

3   MR. WALL:

4          I'd like to just enter an

5          objection before he ends up testifying

6          about what this offer of proof is, if

7          it's going to be an offer of proof.  I

8          don't know what these documents are

9          and if ultimately if he believes that

10         the Board -- that you've already ruled

11         that they're not relevant, I don't

12         want to have him testifying before the

13         Board about what they are.  If he

14         wants to offer them as proof, he

15         certainly is able to do that after we

16         close the testimony.

17  MR. TAYLOR:

18         In connection with the testimony

19         just given, I offer a letter of proof

20         dated April 9th, 2014, a letter from

21         Dr. Wortham to Leslie Rye, and another

22         letter on July the 14th to Dr. Mouton

23         with reference to the matters that

24         I've just talked about.

25  JUDGE ELLIS:

**Exhibit E**

1                    They will be accepted as a
2          proffer.
3    MR. TAYLOR:
4                    Proffer.
5    JUDGE ELLIS:
6                    Ms. Martin, Proffer 1 and
7          Proffer 2.
8    BY MR. TAYLOR:
9        Q.   With respect to the complaint that was
10   filed --
11   MR. WALL:
12                   Exhibit 6.
13   BY MR. TAYLOR:
14       Q.   -- Document 6, did you investigate to
15   see where this Internet document came from?
16   MR. WALL:
17                   Objection, relevance.
18   JUDGE ELLIS:
19                   No, that's okay.
20   THE WITNESS:
21                   Did I investigate to see where
22          it came from?
23   BY MR. TAYLOR:
24       Q.   Yes.
25       A.   No.

1      Q.   If I were to tell you that the
2   complainant attached a document that
3   Ms. Dionne apparently put on the Internet, or
4   was complicit, and that this is a portion of
5   Psychiatric Time Database on the Internet,
6   would you know that?
7   MR. WALL:
8                 Objection, relevance.
9   BY MR. TAYLOR:
10     Q.   Where this came from?
11  JUDGE ELLIS:
12                Insofar as she may have based
13          her opinions to some extent on that
14          material and she said she read it but
15          didn't pay a lot of attention to it,
16          but insofar as it relates to that, I'm
17          going to let it go.
18  BY MR. TAYLOR:
19     Q.   That was part of the complaint, and
20  you made it part of what you considered?
21  MR. WALL:
22                Objection, asked and answered.
23          She testified on direct.
24  JUDGE ELLIS:
25                She's already answered that.

1   MR. TAYLOR:

2              Okay.

3   BY MR. TAYLOR:

4      Q.   Now, if I were to tell you that this

5   website, Psychiatrist Crime Database, is a

6   database that is operated by the Church of

7   Scientology which does a lot of bashing of

8   psychiatrists, would you know that?

9   MR. WALL:

10             Objection, relevance.

11  JUDGE ELLIS:

12             Yeah, I think that's not

13         relevant.  I'll sustain the objection.

14  BY MR. TAYLOR:

15     Q.   Would you know that?

16     A.   No.

17  JUDGE ELLIS:

18             I just sustained the objection.

19  BY MR. TAYLOR:

20     Q.   Well, with respect to the first

21  question, if you had known, would that have

22  been relevant to your investigation?

23  MR. WALL:

24             Objection, relevance.  She

25         testified on direct about the weight

**Exhibit E**

1              or lack of weight she gave this.

2    JUDGE ELLIS:

3                   Let's not speculate about

4          something.  I sustain that objection.

5    MR. TAYLOR:

6                   I'll make a proffer --

7    JUDGE ELLIS:

8                   Okay.

9    MR. TAYLOR:

10                  -- of the source.

11   JUDGE ELLIS:

12                  What is that?  That's the

13         complete thing showing the source?

14   MR. TAYLOR:

15                  It's two, the source of the

16         complainant's complaint that she

17         attached and submitted to the Board.

18   JUDGE ELLIS:

19                  Okay.

20   MR. TAYLOR:

21                  One is Psychiatric Crime

22         Database.

23   JUDGE ELLIS:

24                  That's Proffer 3.

25   MR. TAYLOR:

**Exhibit E**

1            3, that starts with the Citizens

2       Commission on Human Rights, pages 1

3       and 2.  And the other is the

4       allegations from Ms. Dionne which is

5       cropped on the complaint:  Sex is

6       never a part of professional

7       treatment - but it is the basis for a

8       malpractice lawsuit, as 2.

9   MR. WALL:

10            4.

11  MR. TAYLOR:

12            4, I'm sorry.

13  JUDGE ELLIS:

14            That would be 4, right.

15  MR. TAYLOR:

16            Excuse me just a moment.

17  JUDGE ELLIS:

18            Please.

19  MR. TAYLOR:

20            I probably have one more

21       question.

22  JUDGE ELLIS:

23            Mr. Taylor, we have to move

24       along.  Do you have any more questions

25       for this witness?  I said, do you have

1        any more questions of this witness,

2        Mr. Taylor?

3   MR. TAYLOR:

4             I have one more question.  I'm

5        sorry.

6   JUDGE ELLIS:

7             Oh.  Ask it, please.

8   BY MR. TAYLOR:

9     Q.   The complaint was made on the 25th of

10  March, 2014, and on the 28th, according to

11  Exhibit 5, you concluded that an evaluation

12  was necessary; is that correct?

13    A.   Yes.

14    Q.   And did this on the basis of the

15  information you had, as you testified to,

16  three days?

17    A.   Yes.  But let me clarify.  With --

18  with my director, yes.

19  MR. TAYLOR:

20             I'm sorry.  I have no further

21        questions.

22  JUDGE ELLIS:

23             Thank you.  Do you have any

24        redirect?

25  MR. WALL:

**Exhibit E**

1              Just very briefly.

2        R E D I R E C T   E X A M I N A T I O N

3   BY MR. WALL:

4        Q.    Ms. Rye, you haven't decided that

5   Dr. Hunter was involved or engaged in

6   professional sexual misconduct, have you?

7        A.    No.

8        Q.    What is the primary role of this Board

9   as relative to the public?

10        A.    To assure that the licensees are safe

11   to practice, to assure that the public is safe

12   with the practice of our licensees.

13        Q.    And, by extension, your job as an

14   investigator and compliance officer is to sort

15   of attempt to fulfill that roll; is that true?

16        A.    Yes.

17        Q.    Now, you don't have any personal

18   animosity towards Dr. Hunter, do you?

19        A.    No.

20        Q.    You don't take any great desire in

21   involving physicians in requests for

22   evaluations, do you?

23        A.    No.

24        Q.    And ultimately, it wasn't you that

25   made the decision to order an evaluation,

**Exhibit E**

1    correct?

2         A.    Correct.

3         Q.    This Board ordered the evaluation; is

4    that correct?

5         A.    Correct.

6         Q.    You weren't in a position, and you

7    don't make any determinations specifically as

8    to whether or not Dr. Hunter is safe to

9    practice, do you?

10        A.    No.

11        Q.    Your role is to facilitate the

12   investigation; is that right?

13        A.    Correct.

14        Q.    And one of the tools that you use and

15   the Board uses are evaluations; is that right?

16        A.    Correct.

17        Q.    And that's because your --

18   MR. TAYLOR:

19              I'm going to object for a

20         moment.  I understand it's an

21         administrative hearing, but leading

22         questions are a bit much right now.

23   JUDGE ELLIS:

24              I can't hear you.

25   MR. TAYLOR:

1              I said leading questions are a
2         bit much at this point.
3    JUDGE ELLIS:
4              They are really leading
5         questions.
6    BY MR. WALL:
7      Q.   What you described for the Board,
8    ultimately, what you're attempting to do and
9    what the investigative part of the Board is
10   attempting to do when it orders an evaluation
11   of a physician?
12     A.   Yes.  As an investigator, my role is
13   to investigate complaints, to receive
14   complaints, make a recommendation to my
15   director regarding complaints received.  From
16   there, the decision is made for the licensee,
17   what the recommendation is for the licensee.
18   If at that level the licensee does not comply
19   with the recommendation, then the matter is
20   brought to the Board, the Board then makes the
21   decision, in this case, the sick physician
22   order.  If again the licensee does not comply,
23   the matter is brought again back to the Board,
24   in this case, a summary suspension.
25   MR. WALL:

**Exhibit E**

1                 That's all the questions I have,

2            Ms. Rye, thank you.

3    JUDGE ELLIS:

4                 Does any Board member have

5            questions?

6    DR. AMUSA:

7                 Yes.  Ms. Rye, you commented a

8            couple of times that Dr. Hunter had

9            reservations about attending a BMI

10           evaluation.  Were you given any

11           reasons for that?

12   DR. VALENTINE:

13                I couldn't hear you.

14   JUDGE ELLIS:

15                What was the question?

16   DR. AMUSA:

17                The reasons for -- that

18           Dr. Hunter had reservations for

19           attending BMI, and I was wondering

20           what the reasons -- what reason was

21           given regarding those reservations.

22   THE WITNESS:

23                I had a conversation with

24           Dr. Hunter, and I'm not sure I

25           remember all the details of that

**Exhibit E**

1          conversation except that he did not

2          trust BMI.

3   DR. AMUSA:

4               Okay.  Dr. Hunter apparently

5          stated to you that he could not afford

6          the expense of an evaluation at ACUMEN

7          and that he had applied for loans and

8          apparently was turned down to get that

9          money.  Was there any documentation

10         given to you showing that he had

11         applied for loans and were denied, and

12         those loan applications were denied?

13   THE WITNESS:

14              No.

15   DR. AMUSA:

16              Did you request that?

17   THE WITNESS:

18              No.

19   DR. AMUSA:

20              All right.  Thank you.

21   JUDGE ELLIS:

22              That's all.

23   MR. WALL:

24              Subject to reserving the right

25         to call a rebuttal witness,

```
1              complainant rests.
2   JUDGE ELLIS:
3              Okay.  Why don't we take a
4          five-minute recess, and then you can
5          put on your case, Mr. Taylor.
6              (A brief break was taken.)
7   JUDGE ELLIS:
8              Okay.  Mr. Taylor, your case.
9   MR. TAYLOR:
10             I call Dr. Hunter.
11         (At this time, GREGG S. HUNTER, MD was
12         duly sworn in by Dr. Farris.)
13             E X A M I N A T I O N
14  BY MR. TAYLOR:
15     Q.   Dr. Hunter, would you state your full
16  name for the record, please?
17     A.   Gregg Spaulding Hunter.
18     Q.   And you are a --
19  JUDGE ELLIS:
20             Just a minute.  Talk to us.
21  THE WITNESS:
22             Gregg Spaulding Hunter.
23  JUDGE ELLIS:
24             Thank you.
25  BY MR. TAYLOR:
```

**Exhibit E**

1      Q.   And, Dr. Hunter, you are a suspended

2    physician in the state of Louisiana; are you

3    not?

4      A.   As of May 30th, yes, sir.

5      Q.   Would you just give the Board a brief

6    history of your background as a physician and

7    your education, please?

8      A.   I completed medical school from

9    Meharry Medical College.  I did an internship

10   there at Meharry Medical College Public

11   Hospital, and then went back to my hometown,

12   Washington, DC, and completed a three-year

13   residency training program at Howard

14   University Hospital in 1996.  I practiced in

15   Washington, DC, as well as the state of

16   Mississippi, and I was licensed to practice by

17   the Louisiana State Board of Medical Examiners

18   in 2001.

19     Q.   Okay.  And where have you practiced in

20   Louisiana?

21     A.   I've practiced in Alexandria,

22   Louisiana; Houma, Louisiana; and since 2010,

23   in Lafayette, Louisiana.

24     Q.   Okay.  And there has been discussion

25   about you being in a Physician Health

1    Program.  How long were you in that, or have

2    you been in that program?

3         A.    Since 2009.

4         Q.    And why were you in that program?

5         A.    For substance abuse of marijuana and

6    alcohol.

7         Q.    And since you have been in that

8    program, have you complied with the demands

9    made upon you for successful completion of

10   that program?

11        A.    I have been fully compliant.

12        Q.    Okay.  When you say fully compliant,

13   what do you do to comply?

14        A.    I submit to random urine drug screens

15   which may average once a week to several times

16   monthly.  I've had no positive urine drug

17   screens in over four and a half years with the

18   Physician's Health Program.  I attend a

19   minimum of two AA or NA meetings weekly.  I

20   attend a weekly conduces meeting which is a

21   meeting of recovering physicians and

22   healthcare professionals.  I have a sponsor

23   that I maintain regular active contact with

24   who is a recovering dentist here in the state

25   of Louisiana.  I submit monthly supervisory

1    reports as required by the Physician's Health

2    Program by a Dr. Roger Wortham who serves as

3    my supervisor and monitor.  I send monthly

4    reports as well documenting all of my meetings

5    and attendances and make arrangements for

6    urine drug screens for any in- or out-of-state

7    travel.

8         Q.   During this period that you have been

9    in the program, have there been any complaints

10   made against you other than this one?

11        A.   No, sir.

12        Q.   Now, you heard the testimony that with

13   respect to this complaint -- I want you to

14   confirm that no one has ever interviewed you

15   or talked to you about the allegations against

16   you.

17        A.   Not in a specific manner, no.

18        Q.   Has Dr. Rye interviewed you about the

19   specifics of this complaint?

20        A.   No.

21        Q.   Have you had any opportunity, other

22   than what you have written, to talk about the

23   complaint prior to being ordered to an

24   evaluation?

25        A.   I attempted to schedule meetings with

**Exhibit E**

1    Dr. Mouton unsuccessfully.  I had no

2    opportunity to present this case or explain

3    beyond a written response that I had taken

4    upon myself to provide to the Board.  I've not

5    had any opportunity beyond today to even

6    defend myself or explain my side of this case

7    whatsoever.

8         Q.   Now, Dr. Hunter, let me just go back

9    to something.  I'll ask you this question.

10   Are you willfully refusing to do an

11   evaluation?

12        A.   Not at all.  And I verbalized that to

13   Ms. Rye as well as the one occasion that I did

14   get to talk to Dr. Mouton on the phone.  I've

15   made every effort, you know, according to my

16   consent order and my obligation to comply with

17   any Board orders or recommendations.  However,

18   I did explain to her that I have been under

19   extreme financial hardship, that I simply did

20   not have the $7,000 to $7,500 for these

21   evaluations as had been ordered.  That's not

22   even counting the travel or other expenses

23   associated with the evaluations.

24        Q.   The question was asked about your

25   problems with BMI.  Would you explain what

**Exhibit E**

1   your problem with BMI was?

2       A.   Well, when I initially got the letter

3   dated March 29th ordering me -- well,

4   recommending me for evaluation at BMI, I was

5   somewhat appalled that three days after the

6   initial complaint was filed that it seemed

7   that Dr. Mouton and Ms. Rye had already made a

8   conclusion that I needed to go away for an

9   evaluation.  And having been through

10  evaluations before for substance abuse and

11  knowing how the process is, I called BMI first

12  and foremost to ask what would be the cost of

13  their evaluation, and I was told that their

14  evaluation, I think, was $6,500 that needed to

15  be -- $1,000 needed to be submitted a week

16  before the evaluation and the other remaining

17  $5,500 balance needed to be due at the time of

18  arrival, and I did not have those kind of

19  resources.

20      Q.   Did you inquire as to what kind --

21  beyond the initial evaluation, were they

22  talking about treatment at that time?

23      A.   That's a very good question.  And,

24  again, having been in a situation that I went

25  for a substance abuse evaluation, we sort of

**Exhibit E**

1    -- it's a ongoing joke amongst the conduces

2    meeting that a three-day evaluation turns into

3    three months of treatment.  Of course, this is

4    a different circumstance.  And when I inquired

5    of the person on the phone that was answering

6    my questions, I couldn't get any clear or

7    factual answers on what their process was

8    beyond an evaluation, that if I was, according

9    to their evaluation process, recommended for

10   further treatment, how much that would be,

11   what the length of that would be.  Of course,

12   the Behavioral Medical Institute is in

13   Atlanta, Georgia, so there would be no kind of

14   way to remain in Louisiana or continue

15   practice and undergo their program.

16        Q.   With respect to remaining in practice,

17   did you attempt to try to formulate an

18   alternative that would satisfy the concern

19   about you being in practice?

20        A.   I did.  In my initial conversations

21   with Ms. Rye, I said, well, again, three days

22   after this initial complaint was filed on the

23   25th, without interviewing me or talking to me

24   or reviewing the patient's medical record,

25   which I would have readily made available,

**Exhibit E**

1  otherwise, I was being ordered to undergo this
2  evaluation, and I simply did not have the
3  resources.  And I even explained to Ms. Rye,
4  you know, psychiatrists don't make a whole lot
5  of money and, as she knows my history, I have
6  overcome major hurdles in trying to
7  reestablish my practice, complying with the
8  PHP, doing everything that had been asked of
9  me to do.  And I don't think she was very
10 interested in the fact that I have, you know,
11 child support and children to support and
12 other things.  And it was made clear to me
13 that the evaluation was what Dr. Mouton was
14 recommending and that I wasn't being offered
15 very many other choices.
16      I asked were there any options for
17 some kind of forensic or evaluation of that
18 nature here in the state of Louisiana.  I
19 found it very hard to believe that in this
20 state that the Board serves that there aren't
21 competent professionals that could perform
22 these evaluations here within the state which
23 would obviously be cheaper, at least, more
24 cost-effective transportation or otherwise.
25      Q.   Did you have a conversation with

**Exhibit E**

1    Dr. Mouton about, you know, costs and

2    alternatives?

3    MR. WALL:

4              Objection, asked and answered.

5    JUDGE ELLIS:

6              Did you?

7    THE WITNESS:

8              I did have a phone conversation

9         with Dr. Mouton, yes.

10   JUDGE ELLIS:

11             Okay.

12   BY MR. TAYLOR:

13       Q.   All right.  And what was the substance

14   of that conversation?

15       A.   Well, as I recall, that conversation I

16   think took place April the 14th.  Dr. Mouton

17   and I, I think, have -- though she represents

18   the public -- have had a very good working

19   relationship.  I explained to her that I in no

20   way, shape, form, or fashion -- when she asked

21   me did I want to fight the Board that I said,

22   I in no way, shape, form, or fashion want to

23   fight the Board.  Having been through

24   treatment before and losing license one really

25   comes to respect that it is indeed a privilege

1    and not a right to practice, and I have done

2    everything within my power to regain and

3    retain my license up until this complaint took

4    place.  I tried to plead my case to

5    Dr. Mouton, Dr. Mouton, I do not have

6    $7,500 -- I don't know if I have $750 at that

7    time, and pleaded with her to consider some

8    other reasonable options or alternatives.

9        Q.   Okay.  And was there any conversations

10   about you borrowing the money?

11       A.   Yes.  She ended the conversation

12   pretty much telling me, well, as I quote, You

13   better go borrow the money.  And I was just

14   really floored.  I found it to be very

15   unfair.  There really didn't appear to be any

16   regard beyond me and my situation but to any

17   kind of due process with regard to this

18   investigation.  And in my, regardless, I

19   guess, medical opinion doesn't matter as much,

20   I just felt that I wasn't given a fair chance,

21   and I did not have the resources.

22          And, again, Ms. Rye, who I didn't know

23   was present in the room, obviously, as there

24   seemed to be more of a heated exchange between

25   Dr. Mouton and I, and I politely, you know,

1    stated to Dr. Mouton, I said, Dr. Mouton, why

2    are you yelling and screaming at me?  And she

3    said, Because Ms. Rye is here present on the

4    phone.  And I just found it to be rather odd

5    that Ms. Rye would be there and her not be

6    introduced during that phone conversation.

7    However, I continued to, you know --

8    MR. WALL:

9                I'm going to object to the

10            nonresponsiveness of the answer.  It

11            has nothing to do with the question.

12    JUDGE ELLIS:

13                Okay.

14    BY MR. TAYLOR:

15     Q.   Dr. Hunter, did you, in response to

16    Dr. Mouton's suggestion to borrow money, did

17    you attempt to borrow the money?

18     A.   I did indeed attempt to borrow the

19    money.

20     Q.   From whom did you attempt to borrow

21    the money?

22     A.   I bank personally and business-wise at

23    Chase Bank.  I contacted the person who set up

24    my bank account.

25     Q.   Are these copies of the responses from

**Exhibit E**

1    the bank that you attempted to borrow money?

2        A.    (Reviews documents.)

3              Yes.

4    MR. TAYLOR:

5                  I'd like to introduce those as

6              -- what do we call ourselves in here?

7    MR. WALL:

8                  Respondent.

9    JUDGE ELLIS:

10                 You call yourself respondent.

11   MR. TAYLOR:

12                 -- Respondent 1 and Respondent

13             2, responses from Chase Bank.

14   MR. WALL:

15                 I'm going to object to seeking

16             to introduce these particular

17             documents on the grounds, number one,

18             of relevance.  The issue of the

19             financial abilities really don't have

20             any relevance to the failure to comply

21             with an order.  Secondarily, these

22             particular documents are limited in

23             nature, and they have to do with

24             apparent applications for credit cards

25             and not necessarily overall efforts to

**Exhibit E**

```
 1            obtain any type of loan or other
 2            financial considerations.
 3   JUDGE ELLIS:
 4                 I guess I better look at them.
 5            Bring them up to me.
 6   MR. TAYLOR:
 7                 Yes, sir.
 8   MR. WALL:
 9                 It's the same thing, right?  You
10            can have my copy.  They can hang onto
11            theirs.
12   THE WITNESS:
13                 One is from a professional --
14            both of these are the same.  One is an
15            attempt --
16   JUDGE ELLIS:
17                 Hold on.  I'm going to let them
18            in.
19                 You applied for business credit
20            cards to pay this bill with?
21   THE WITNESS:
22                 That was the only option
23            available.
24   JUDGE ELLIS:
25                 Okay.  I'll let it in.  You got
```

**Exhibit E**

1              any more questions about it?

2    MR. TAYLOR:

3                   I have no more questions of

4         him.  No further questions.

5    JUDGE ELLIS:

6                   You're through with this

7         witness?

8    MR. TAYLOR:

9                   Yes, sir.

10   MR. WALL:

11                  Okay.  Cross-examine.

12        C R O S S - E X A M I N A T I O N

13   BY MR. WALL:

14        Q.   Very briefly, Dr. Hunter, you received

15   the recommendation to go to an evaluation on

16   March 28th, the letter on March 28th; did you

17   not?

18        A.   Several days after by both certified

19   and regular mail.

20        Q.   All right.  And in response to that,

21   you sent a letter; did you not?  I'm sorry.

22   Let me give you this.  And I'll refer you to

23   Exhibit 7, I believe.  It's your letter of

24   April 7th, 2014; is that correct?

25        A.   (Reviews document.)

**Exhibit E**

1        Yes, it is.
2    Q.   It's a three-page -- three and a half
3 page letter that you wrote directed to
4 Dr. Mouton; is that right?
5    A.   Yes, it is.
6    Q.   In addition to that three-page letter,
7 what other information did you want to
8 communicate to Ms. Rye or Dr. Mouton about the
9 particular complaint in this case?
10   A.   There were a number of things I wanted
11 to communicate.  I was hoping to have an
12 opportunity as part of the investigation
13 process to sit down and discuss with them the
14 physician side of the story, my treatment
15 experience with the Complainant A.B..  I
16 wanted to share the medical record that I had
17 available.  I wanted to dispute a number of
18 her claims, one even being that she presented
19 for four sessions, when she did, as I have
20 documented, present for five sessions.
21   Q.   Didn't you include all of that in this
22 letter?  On that last point, I'll direct you
23 to the third full paragraph on page 2 of your
24 letter:  Contrary to Ms. B█████'s statement,
25 my records show she did present to a scheduled

**Exhibit E**

1    appointment on March 12.  Do you see that?

2        A.    Yes, sir.

3        Q.    Isn't that what you wanted to

4    communicate to the investigative staff?

5        A.    In doing so, I also wanted to show

6    them the actual chart of where that was

7    documented beyond this letter.

8        Q.    All right.  Did anything prevent you

9    from submitting the chart when you wrote this

10   letter and providing it to the Board?

11       A.    I wasn't requested to do so, and I

12   didn't know at that point what the procedure

13   was with regard to outside of HIPAA policies

14   and procedures, you know, what the complaint

15   response would be with regard to the chart

16   itself.

17       Q.    The representations that you made in

18   the letter about the particular encounters

19   include those things that you've provided in

20   your medical record, correct?

21       A.    Not to its completeness, no.

22       Q.    But it included the salient points of

23   your contention about the interactions,

24   correct?

25       A.    No.  There are still other salient

**Exhibit E**

1    points in that chart that I have yet had an

2    opportunity during the, quote/unquote,

3    investigative process to present to the Board,

4    Dr. Mouton, Ms. Rye, or anyone.

5        Q.   How many telephone conversations do

6    you think you had with Ms. Rye over the period

7    from March 28th up through May 19th?

8        A.   I beg your pardon?  Repeat that.

9        Q.   How many telephone conversations do

10   you think you had with Ms. Rye and/or

11   Dr. Mouton between April 28th when you first

12   received this complaint and May 19th when this

13   Board ordered you to go to an evaluation?

14       A.   I received the letter before April

15   28th.

16       Q.   I'm sorry.  Did I say April?  I

17   apologize.  March.  March 28th.  The question

18   was:  How many telephone conversations did you

19   have with Dr. Mouton and Ms. Rye?

20       A.   I've had one phone conference that I

21   discussed with Dr. Mouton herself.  I may have

22   talked to Ms. Rye four or five times.

23       Q.   Sure.  And in any one of those

24   occasions, did Ms. Rye tell you that she

25   wasn't willing to receive the medical record

**Exhibit E**

1    that you believe was important for her to

2    have?

3         A.   It was never discussed.

4         Q.   You didn't ever inquire with her

5    whether or not you would be in compliance with

6    HIPAA if you provided that medical record to

7    her?

8         A.   HIPAA wasn't the biggest issue at

9    hand.  Obviously, by the fact that we're

10   before the Board, the HIPAA wasn't the biggest

11   issue.  My biggest issue was wanting to sit

12   down face-to-face with Dr. Mouton and Ms. Rye

13   and discuss the case.

14        Q.   Didn't you just tell the Board,

15   though, that the concern that you had in

16   regard to producing the medical record was

17   HIPAA?

18        A.   I said that was one of my concerns

19   when you asked why didn't I just send the

20   record.

21        Q.   Up until May 19th when this Board

22   issued the order ordering you an evaluation,

23   the evaluation was simply a recommendation on

24   the part of the investigative staff of the

25   Board; is that correct?

**Exhibit E**

1      A.   It eventually went from a

2  recommendation to an order for an evaluation.

3  And as I sort of alluded to earlier, as is

4  typically the case sometime for substance

5  abuse, which is a whole different issue, it

6  went from a recommendation to a order from the

7  Board.  And then on the document that I

8  received, I think it was the 19th of May, it

9  went from, again, a recommendation to an

10  evaluation to, quote/unquote, treatment.

11      Q.   Well, let's take a look at that.

12  First off, let me make sure that I understand

13  your testimony.  You will agree with me, will

14  you not, that between March 28th or 29th

15  whenever you received the original letter from

16  Ms. Rye, and up to May 19th of 2014, during

17  that time period, it was solely a

18  recommendation on the part of the Board

19  investigative staff that you go have an

20  evaluation, correct?

21      A.   When you say a sole recommendation

22  under voluntary circumstances, how voluntary

23  is it if your failure to submit could, and in

24  my case has, resulted in a summary

25  suspension?  That being stated, as during

1    those four to five conversations that I had

2    with Ms. Rye and during my conversations that

3    I had with Dr. Mouton, I told them my lack of

4    financial resources does not equate to

5    refusing to follow the Board's order,

6    recommendation, or otherwise for this

7    evaluation.  I simply did not have the money

8    to go and do it.

9         Q.   Sir, that's not my question.  This is

10   the question that I'm asking you.  Please

11   answer the question.  Between March 28th, 2014

12   and when you received -- that date you

13   actually received the letter from Ms. Rye, if

14   that's a day or two later, up until the point

15   when you received an order by this Board

16   ordering you to go to an evaluation, it was a

17   recommendation, was it not, of the Board's

18   investigative staff that you undertake an

19   evaluation, correct?

20        A.   It went from a recommendation for an

21   evaluation to a order for treatment.

22        Q.   Well, we're going to get to the order

23   in a second.  But you still have not answered

24   the question.  But, anyway, I'll proceed

25   forward, because I believe the Board can

**Exhibit E**

1    appreciate the issue.  During the time period

2    between March 28th and up till the time when

3    the Board ordered the evaluation, you were

4    having ongoing conversations with

5    investigative staff, correct?

6         A.   I've had about four to five

7    conversations.  They weren't long

8    conversations.  They really didn't get into

9    the merits of the case whatsoever.  There were

10   discussions about where I was being

11   recommended to go, and my responses that I

12   couldn't afford to go.

13        Q.   But did you, in fact, agree to go to

14   the evaluation; did you not?

15        A.   I agreed to call and make the

16   arrangements is what I agreed to.

17        Q.   So to make sure that I understand and

18   make sure this Board understands, when you

19   were talking with the investigative personnel,

20   you weren't telling them you were going to

21   actually go to the evaluation, you simply said

22   you were going to make the arrangements; is

23   that what you're saying?

24   MR. TAYLOR:

25                    I object.  I object.  That's

**Exhibit E**

1    badgering the witness.  I think it's
2    very clear that what this witness has
3    said is that he was attempting to make
4    the arrangements, and he did attempt
5    to make the arrangements.  He didn't
6    have the money, and communicated that
7    fact.  There's no need to beat him up
8    about that.
9  MR. WALL:
10    It's not a matter of beating him
11    up.  I'm simply asking to make sure
12    that I understand the question.  The
13    question directed to him was whether
14    he agreed at some point to undertake
15    the evaluation.  That's a simple "yes"
16    or "no."
17  JUDGE ELLIS:
18    That's a good question.  Did
19    you?
20  THE WITNESS:
21    I agreed to call and discuss
22    making the arrangements.  And upon
23    calling to discuss making the
24    arrangements, I didn't have the
25    resources that they wanted up front.

1    JUDGE ELLIS:

2              Okay.  He says he didn't agree

3         to do it; he says he agreed to call.

4    MR. WALL:

5              Fair enough.  Fair enough.

6    BY MR. WALL:

7    Q.   During your conversations, though, you

8    could have provided whatever information you

9    needed to provide to the investigative staff,

10   correct?

11   A.   It appeared at that point it didn't

12   matter, that there was already a foregone

13   decision and conclusion made that regardless

14   of what I said, what information I provided,

15   that you're either going to go voluntarily or,

16   as was stated in one of the letters, if you

17   don't, your license could or may be suspended,

18   and eventually it was.

19   Q.   I want to refer your attention to

20   Exhibit 10.  If you would go one, two, three

21   pages -- the fourth page in.  It's a document

22   entitled "Order for Evaluation of Medical

23   Professionals."

24   MR. TAYLOR:

25              Exhibit what?

1    MR. WALL:

2             Exhibit 10.

3    BY MR. WALL:

4       Q.   Do you see that, sir?

5       A.   (Reviews document.)

6            Yes, sir.

7       Q.   Would you please read into the record

8    the third full paragraph?

9       A.   For your reference, we enclose a copy

10   of the Medical Practice Act --

11      Q.   Hang on one second.  You may not be on

12   the right page.

13   MR. WALL:

14            May I approach the witness?

15   JUDGE ELLIS:

16            Yes.

17   MR. TAYLOR:

18            Your Honor, I object again.  It

19            says what it says according to what

20            they have said.  There is no need of

21            going through all of this.  It is

22            clearly established.

23   MR. WALL:

24            Well, I will submit to you that

25            he has made the representation to this

1           Board that their order was ordering
2           him for treatment.  And I want to make
3           sure that we've read into the record
4           so that everyone is aware that there
5           is no suggestion of any treatment.
6           He's ordered and directed to undergo
7           an evaluation.
8   JUDGE ELLIS:
9              Okay.  Well, it's right there.
10  MR. TAYLOR:
11             It's in there.
12  JUDGE ELLIS:
13             I'm going to sustain the
14          objection.  You don't have to answer
15          the question.
16  BY MR. WALL:
17     Q.   Looking at the page, was this the
18  order that you received, Dr. Hunter?
19     A.   Yes, sir.
20     Q.   And the contents of the order is what
21  you were ordered to do by this Board; is that
22  correct?
23     A.   Yes, sir.
24     Q.   Was the Board ordering you for any
25  type of treatment?

1      A.   Not at that time.  That came later.

2      Q.   Well, did you undergo the evaluation?

3      A.   No, I didn't.  But I was answering the

4  matter about treatment.

5      Q.   I understand.  And the question was:

6  In terms of this order that the Board issued,

7  was there any reference to treatment in it?

8      A.   No.  There was a later reference to

9  treatment.

10      Q.   In this order?

11      A.   In the documentation I received, yes,

12  sir.

13      Q.   Are the documents you're referring to

14  exhibits?

15      A.   Yes.  Yes, it is.

16      Q.   You're referring to the summary

17  suspension; is that right?

18      A.   If I could find it in this --

19      Q.   That would be Exhibit Number 3?

20      A.   (Reviews document.)

21           Exhibit 3.  Yes.  It states that as of

22  today I have not gone into treatment.  It went

23  from a recommendation to an evaluation that --

24  it was substantiated that the reason my

25  license was suspended now went from

**Exhibit E**

1  recommendation to evaluation, that as of

2  today's date you have not gone into treatment.

3      Q.   Well, let's take a look at the actual

4  Order for Summary Suspension which is further

5  into that document.  Turn a couple pages in.

6  It's the last page of Exhibit 3.  You see

7  that?  It's entitled "Order for Summary

8  Suspension of Medical License."

9      A.   Yes.

10      Q.   And anywhere in that particular order,

11  is there a requirement that you undergo

12  treatment?

13      A.   Not on that page, but on the

14  aforementioned page it was an order for

15  treatment.

16      Q.   Well, the order is here; is it not?

17  The letter that you're referring to is a cover

18  letter; is that right?

19      A.   I mean, at that point it was all the

20  same to me.

21      Q.   Well, in this order on the last page

22  of this, is there any requirement that you

23  undergo treatment?

24  MR. TAYLOR:

25              With all due respect, the facts

1          are established.  He didn't go to the

2          evaluation.  The reasons are

3          established.  We can go over and over

4          this again.  The suspension order is

5          in the record.  There's no need of

6          browbeating about this over and over.

7          The documents speak for themselves.

8   JUDGE ELLIS:

9              Well, I don't think there's any

10         browbeating, but I do think that we

11         don't need to go into it any further.

12         The situation is crystal clear.

13   MR. WALL:

14             Certainly.

15   MR. TAYLOR:

16             And?

17   JUDGE ELLIS:

18             No further.

19   BY MR. WALL:

20      Q.   Let me ask you some further

21   questions.  I want to refer you to Exhibit 11

22   -- excuse me, Exhibit 12 in the documents.

23   Would you please refer to Exhibit 12?  That's

24   your PHP Monitoring Contract; is that correct?

25      A.   (Reviews document.)

1          Yes.

2      Q.    And I'll refer you to page 5 of 6

3    which is the second to last page of the

4    document down at the very bottom.  Do you see

5    that?

6      A.    Yes.

7      Q.    You understood at that time that you

8    had to undergo an evaluation for professional

9    -- excuse me, you were to undergo a treatment

10   process on professional boundaries at that

11   time, correct?

12     A.    Not only do I understand it, I

13   completed that treatment process at

14   Vanderbilt Center for Professionals

15   Enhancement Program or whatever.  I sat down

16   with Dr. Mouton afterward and shared with her

17   what an enlightening and rewarding experience

18   it was.  I even shared with Dr. Mouton the CD

19   of the course that, you know, the discussions

20   of what those boundary issues are were not

21   only helpful for me but could be helpful for

22   others.

23     Q.    The requirement that you attend the

24   boundary violation course was in addition to

25   the issue related to the ongoing care and

**Exhibit E**

1    treatment that you had regarding substance

2    abuse; isn't that true?

3        A.   I don't know if that's true or not,

4    but I was compliant.

5        Q.   Certainly.  So in addition to the

6    issues in regard to pornography, at a time

7    prior to the complaint being filed by A.B.,

8    you did have discussions with the Board, with

9    Board personnel, investigative personnel,

10   regarding allegations made in a lawsuit,

11   correct?

12   MR. TAYLOR:

13               Objection.

14   JUDGE ELLIS:

15               What for?

16   MR. TAYLOR:

17               There is nothing in this record

18          about a prior lawsuit other than

19          verbalizations.  There is nothing

20          whatsoever before this Board about

21          some other lawsuit.  And, matter of

22          fact, the evidence is that it wasn't

23          investigated; they don't know anything

24          about it.

25   JUDGE ELLIS:

**Exhibit E**

```
 1                    Well, you asked --
 2   MR. WALL:
 3                    He questioned Ms. Rye
 4           extensively on it, and she testified
 5           specifically that there were
 6           information and just because it
 7           wasn't produced --
 8   JUDGE ELLIS:
 9                    I'll overrule the objection.
10   MR. WALL:
11                    Thank you.
12   BY MR. WALL:
13       Q.   So you had discussions with Board
14   personnel about a lawsuit that was filed
15   against you, correct?
16       A.   I don't recall if we specifically
17   discussed the nature of the lawsuit.  There
18   was a meeting held with myself and Dr. Mouton
19   around the time that my license had been
20   reinstated.  At that time, I think that
21   Ms. Rye was present.  Reverend Nelson Dan
22   Taylor was also present, not as a legal
23   advisor but as a person also that serves a
24   pastoral function, and those issues were
25   discussed.  At that time, the boundary course
```

1   was recommended, but there was no information,

2   no cause, or no reason, as evidenced by the

3   fact that my license was indeed reinstated,

4   that that would have been deemed an issue way

5   back in 2009 from an issue five years

6   previously that I was in any way a danger to

7   my patients, female or otherwise.

8        Q.   The allegations involving the lawsuit

9   relate to sexual misconduct; do they not?

10  MR. TAYLOR:

11                    I object.  I object.

12  JUDGE ELLIS:

13                    I know.  Why?

14  MR. TAYLOR:

15                    I object because they have sat

16            here and testified that they don't

17            know anything about this lawsuit, they

18            don't know what the allegations are.

19            And, no, the allegations are not about

20            sexual misconduct.  The allegations

21            are now about --

22  JUDGE ELLIS:

23                    Well, I don't want you to start

24            testifying.  But I think that's

25            right.  I think that's right.  We know

1           there's a lawsuit out there.  You-all

2           don't know anything about the lawsuit

3           except that it's out there.

4   MR. WALL:

5               Well, the point of this

6           questioning, though, is to establish

7           that, in fact, there were discussions

8           with Dr. Hunter about the allegations

9           and the concerns about the lawsuit.

10          That information is contained in the

11          Board record and it is part of the

12          consideration for recommending and

13          ultimately having him ordered to go to

14          an evaluation.

15  JUDGE ELLIS:

16              Did you have any conversations

17          with Board personnel about the

18          allegations in that lawsuit?

19  THE WITNESS:

20              When those issues -- and we're

21          talking, again, five years

22          previously.  I don't recall the exact

23          details.  But from my understanding,

24          again, and just by a matter of fact --

25  MR. TAYLOR:

**Exhibit E**

```
 1                    Please, may I object again?
 2    JUDGE ELLIS:
 3                    Yes, sir.  Overrule the
 4           objection.  Go ahead.  I'll overrule
 5           the objection.
 6    JUDGE ELLIS:
 7                    I want you to finish testifying.
 8    THE WITNESS:
 9                    That by definition of fact, my
10           license beyond --
11    JUDGE ELLIS:
12                    Wait a minute.  I didn't ask you
13           that.  I asked you if you discussed
14           the allegations in that lawsuit with
15           Board personnel.  That's all I asked.
16    THE WITNESS:
17                    Not in any specific detail.
18    JUDGE ELLIS:
19                    Okay.  That's the answer to that
20           question.
21    BY MR. WALL:
22       Q.  Although not in detail, certainly the
23    issue involving the lawsuit and those
24    allegations involving sexual misconduct did
25    come up, correct?
```

 1    MR. TAYLOR:

 2              I'm objecting again.  The answer

 3         is no.

 4    JUDGE ELLIS:

 5              Let's leave this alone.  I asked

 6         him your question.  He answered your

 7         question.  And let's go on from there.

 8    MR. WALL:

 9              That's all the questions I

10         have.  Thank you.

11    JUDGE ELLIS:

12              Re-direct?

13         R E D I R E C T   E X A M I N A T I O N

14    BY MR. TAYLOR:

15       Q.   Dr. Hunter, you were asked a lot of

16    questions about what happened and

17    opportunities to discuss.  Is not it a fact

18    that on March the 28th you got a letter

19    telling you that a complaint had been filed on

20    March the 25th and that you were directed at

21    that point to go get an evaluation?

22    MR. WALL:

23              Objection, leading.  Objection

24         to asked and answered.  Objection to

25         the fact that the evidence is he's

1          already testified about this.

2   MR. TAYLOR:

3               All right.  Fine.  No further

4          questions.

5   JUDGE ELLIS:

6               Dr. Amusa, did you have any

7          questions?

8   DR. AMUSA:

9               Yes.  Dr. Hunter, there's been a

10          lot of testimony today about the fact

11          that your financial resources are

12          very, very poor.  I was wondering if

13          you could help the Board understand

14          why that is.

15   THE WITNESS:

16               Well, in short, for one,

17          psychiatrists don't make a lot of

18          money.

19   DR. AMUSA:

20               That was never my impression.

21   THE WITNESS:

22               Oh, well, this psychiatrist

23          doesn't.

24   DR. AMUSA:

25               Why is that?

THE WITNESS:

1                For one, I've been in private
2        practice.  The practice is slowly
3        growing.  But I've only been in
4        practice since December of 2011, and
5        it's just been something that takes
6        time to develop.  Within that, I have
7        undergone a divorce that I have -- in
8        which I have a custody case.  I am
9        still some $250,000 in student loan
10       debt from the educational training
11       process to be calling myself
12       Dr. Hunter.  I have a number of other
13       tax obligations and other options -- I
14       mean, obligations in support of my
15       children and trying to keep a roof
16       over my head.

DR. AMUSA:

19                So when you got out of medical
20       school, how much debt were you in?

THE WITNESS:

22                Probably at that time about
23       100,000.

DR. AMUSA:

25                So it went from 100,000 to over

**Exhibit E**

1            250,000?

2    THE WITNESS:

3                At 9 percent interest rate over

4            the course now of 18 years, yes.

5            There were times that I was paying it,

6            and had financial setbacks.  You know,

7            the time when my license was suspended

8            previously, I was out of practice for

9            a year.  You know, the 9 percent

10           interest capitalizes daily.  And, you

11           know, I didn't provide that

12           information as part of this process.

13           But to answer your question, yes, I'm

14           in 250-some odd thousand dollars of

15           student loan debt.

16    DR. AMUSA:

17                So if I understood you correctly

18           earlier as you were answering a

19           question for Mr. Taylor regarding your

20           education, training -- and if I

21           understood you, you finished your

22           residency, I think you said in 1996?

23    THE WITNESS:

24                Yes, ma'am.

25    DR. AMUSA:

**Exhibit E**

1                    And then after that at some

2          point you ended up in Mississippi; is

3          that correct?

4    THE WITNESS:

5                    Yes, ma'am.

6    DR. AMUSA:

7                    So when were you in Mississippi?

8    THE WITNESS:

9                    From '96 to 2001, I think it

10         was.

11   DR. AMUSA:

12                   Okay.  So about five years?

13   THE WITNESS:

14                   Yes, ma'am.

15   DR. AMUSA:

16                   Why did you leave Mississippi?

17   THE WITNESS:

18                   Well, that's when I went through

19         my first divorce and my initial

20         treatment process and eventually wound

21         up completing a residential treatment

22         program for alcohol and marijuana and

23         eventually had a practice opportunity

24         here in Louisiana and had met who

25         would become my second wife, who is

1           from New Orleans, and through
2           reciprocity with the PHP, Louisiana
3           State Board of Medical Examiners,
4           obtained a license.  And moving to
5           Louisiana was somewhat, I guess, my
6           new beginning.
7   Dr. AMUSA:
8               So, I think you said you were in
9           Alexandria and another city about --
10  THE WITNESS:
11              Houma.  Houma, Louisiana.
12  DR. AMUSA:
13              Alexandria, then Houma, then
14          Lafayette?
15  THE WITNESS:
16              Yes, ma'am.
17  DR. AMUSA:
18              And so why did you move between
19          those three cities?
20  THE WITNESS:
21              Well, when I was -- I didn't
22          like Alexandria for reasons I don't
23          want to get into.  But I had a
24          practice opportunity, a great practice
25          opportunity as I was recruited by

| | |
|---|---|
| 1 | Terrebonne General Medical Center in |
| 2 | 2002.  I had passed my written and |
| 3 | oral psychiatry boards, and felt I |
| 4 | was, you know, on my road to recovery |
| 5 | and a new beginning to my life.  They |
| 6 | had a psychiatric unit there called |
| 7 | Bayou Oaks that, for financial or |
| 8 | other physical reasons, Terrebonne |
| 9 | General chose to shut down that |
| 10 | psychiatric unit in 2004.  I |
| 11 | maintained my private practice that I |
| 12 | had been building at that time up |
| 13 | until 2008 after Hurricane Gustav when |
| 14 | my wife, I'll say, evacuated from the |
| 15 | marriage.  It was during that time I |
| 16 | had fallen into relapse and eventually |
| 17 | got a call from the PHP, and it kind |
| 18 | of took, you know, a lot for me to go |
| 19 | back through that process.  But when |
| 20 | you're given a offer I guess you can't |
| 21 | refuse, I did go and complete |
| 22 | treatment.  And I don't look at my |
| 23 | recovery process now four and a half |
| 24 | years again as a liability.  I feel |
| 25 | it's made me a better person, a better |

**Exhibit E**

1          man, a better father and a better
2          physician.
3  DR. AMUSA:
4              So you've been in Lafayette for
5          10 years, did you say?  Since 2010?
6  THE WITNESS:
7              No.  I eventually, after this
8          process when my license was
9          reinstated, had an opportunity in
10         Lafayette to practice at Vermilion
11         Hospital, and it had been my goal and
12         dream to eventually reestablish
13         private practice.  But to answer your
14         question, I've been in Lafayette since
15         2010.
16  DR. AMUSA:
17             So you've been practicing for
18         about four years now in Lafayette?
19  THE WITNESS:
20             Yes.
21  DR. AMUSA:
22             Okay.
23  THE WITNESS:
24             Well, I guess it is 2014, yes.
25  DR. AMUSA:

**Exhibit E**

 1                    Okay.  Thank you.

 2      DR. FARRIS:

 3                    Dr. Hunter, when you were in

 4           Pine Grove -- and I'm not sure what

 5           the right term to use is -- but you

 6           were in a sexual men's group or

 7           something like that?

 8      THE WITNESS:

 9                    There was a sexual issues men's

10           group that I had been referred to

11           after a pornography tape or something

12           of that nature was found in my car.

13           I'd like to explain those

14           circumstances if you would allow me.

15      DR. FARRIS:

16                    Okay.  Please?

17      THE WITNESS:

18                    When I was at Pine Grove, I had

19           one opportunity to travel.  They, for

20           whatever reason, didn't even allow you

21           to use your vehicle in that program

22           there.  I was selling my house in

23           Houma after going through the divorce,

24           and I had boxes and boxes of all kind

25           of belongings in my car just from --

1              that I hadn't been able to put in

2              storage.  And when you return from a

3              travel or visit or whatever, they look

4              through your car.  And looking through

5              this box -- it wasn't anything I was

6              trying to bring into treatment or

7              anything of that nature -- they found

8              a pornography video or something in a

9              box of whatever I had of belongings,

10             and staff then felt that because I had

11             pornography in my car that I warranted

12             being put in this men's issues group.

13   DR. FARRIS:

14             How long did you participate in

15             that?

16   THE WITNESS:

17             That was for -- I guess that

18             travel was around the mid point, so it

19             was for maybe the last month and a

20             half of that treatment process that I

21             participated in that group.

22   DR. FARRIS:

23             That's all I have.

24   DR. VALENTINE:

25             Yes, I have a question.  I'm

**Exhibit E**

1          looking at what you submitted from

2          Chase, and they're dated May 2nd and

3          3rd.  Did you present this information

4          earlier?

5   THE WITNESS:

6               Well, that was during -- from

7          the end of March into April.  The

8          conversation that I had, or the phone

9          conference with Dr. Mouton and

10         Ms. Rye, as I recall, was April 14th

11         when I was told to go borrow,

12         quote/unquote, the money.  And I went

13         to the bank sometime, I don't know if

14         that was on a Friday or Monday, but

15         within that next week.  And the

16         options that were given -- they don't

17         even give small business loans or

18         anything of that nature.  With the

19         amount of debt that I shared with

20         Dr. Amusa, my debt to income ratio was

21         considered beyond what they would

22         consider me for, so the only thing

23         they would offer me was a line of

24         credit, and it took about a week or

25         two before I got those denial

1          statements.

2     DR. VALENTINE:

3               So did they tell you a date that

4          they looked at your credit score as

5          May 1?  But my question was:  Why

6          didn't you submit this sooner?

7     THE WITNESS:

8               I -- for one, I -- well, I'm not

9          going to say I wasn't given an

10         opportunity.  I could have submitted

11         it.  But at that point it seemed that

12         regardless of what I submitted, any

13         attempt to plead my financial

14         situation or otherwise, it was falling

15         on deaf ears.  Dr. Mouton refused to

16         meet with me.  Ms. Rye pretty much had

17         said that either you go or, you know,

18         you're not going to be following the

19         orders, and eventually I got the

20         letter that my license had been

21         suspended.

22    DR. VALENTINE:

23              That's it.

24    JUDGE ELLIS:

25              Is that it?  That's all.  Thank

**Exhibit E**

```
1                  you.  You may step down.
2      THE WITNESS:
3                       Thank you.
4      JUDGE ELLIS:
5                       Have you got another witness?
6      MR. TAYLOR:
7                       I have one other witness, but I
8              don't want to tie up time based on
9              prior rulings.  I have Dr. Wortham,
10             and Dr. Wortham is the monitor for the
11             PHP program.  And I have both of his
12             letters in, and we have testimony
13             about his wanting to expand the
14             monitoring to allow Dr. Hunter to stay
15             in practice.  You've already heard
16             that.  I don't see any useful purpose
17             in repeating that testimony.
18     JUDGE ELLIS:
19                      All right.  Do you rest?
20     MR. TAYLOR:
21                      I'll rest.
22     MR. WALL:
23                      I have one rebuttal witness that
24             I want to call, A███ B████.
25             (At this time, A███ B████ was duly
```

1           sworn in by Dr. Farris.)
2   JUDGE ELLIS:
3               Ma'am, he's going to be asking
4           you questions from over there.  When
5           you give the answers, please look
6           toward the Board.  I know it's hard.
7          D I R E C T   E X A M I N A T I O N
8   BY MR. WALL:
9       Q.   I'm going to refer to you as "A.B."
10  for privacy purposes.  I've put in front of
11  you a copy of the exhibits that have been
12  offered, filed, and introduced into evidence
13  today, and ask you to refer to Exhibit 6,
14  please, and take a look at that.  Take a look
15  at the couple pages, if you don't mind, to
16  make sure you're familiar with that.
17      A.   (Reviews document.)
18           Yes, sir.
19      Q.   Is that the complaint that you
20  provided to the Board?
21      A.   Yes, sir.
22      Q.   Would you please tell the Board why
23  you filed that complaint?
24      A.   I felt that it was necessary because
25  there were things that he said that were

**Exhibit E**

1    inappropriate.

2    MR. TAYLOR:

3                    I am going to object.  We're not

4            getting into the merits.  This is

5            supposed to be rebuttal, and I don't

6            know that this is rebuttal to anything

7            that Dr. Hunter has said.

8    MR. WALL:

9                    Dr. Hunter has testified that

10           he believes --

11   MR. TAYLOR:

12                   That he what?

13   MR. WALL:

14                   Excuse me.

15                   -- he believed that this patient

16           was untruthful.  I questioned him

17           about his response back, and I am

18           simply calling this witness to have

19           her testify about her brief experience

20           with Dr. Hunter.  I am not going to be

21           getting into the allegations that

22           she's made.  I have a few brief

23           questions of her that I think the

24           Board needs to hear in regard to why

25           she filed the complaint.

```
 1    MR. TAYLOR:
 2              You most certainly are getting
 3         into the allegations.  And if you are
 4         going to get into the allegations,
 5         then let's have a trial on the
 6         allegations.
 7    JUDGE ELLIS:
 8              I agree with that, if you're
 9         going to get into that.  If you're
10         not, go ahead.
11    MR. WALL:
12              Not at all.  Not at all.  And he
13         can object to individual questions.
14         And I believe that the judge also can
15         rule.
16    BY MR. WALL:
17         Q.   My question was:  I want to confirm
18    that this was the complaint that you filed,
19    correct?
20         A.   Yes, sir.
21         Q.   And I think the question on the table
22    was:  Why did you file a complaint with the
23    Board?
24         A.   Again, I felt the things that he said
25    during our appointments were not appropriate.
```

**Exhibit E**

1   The four appointments that I had with him, he

2   continued to discuss my sex life, which I had

3   initially gone to him for --

4   JUDGE ELLIS:

5               She is talking about --

6   MR. WALL:

7               She is.

8   MR. TAYLOR:

9               I'm going to object.

10  BY MR. WALL:

11      Q.   Just tell them why you felt the need

12  to file the complaint with the Board.

13      A.   Obviously, I didn't want this to

14  happen to somebody else.  I feel that I was --

15  MR. TAYLOR:

16               I object.

17  MR. WALL:

18               Can she finish her answer,

19          please?

20  JUDGE ELLIS:

21               No.  The time to object is when

22          you hear something that you don't want

23          to hear.

24  MR. WALL:

25               Well, that's true.  Fair enough.

1   JUDGE ELLIS:

2           Now, what's the objection?

3   MR. TAYLOR:

4           I'm objecting because she's

5       testifying to the merits.  The

6       complaint speaks for itself and what

7       it says, and that when we get to

8       merits we'll deal with the merits.

9   JUDGE ELLIS:

10          As I recall, the last thing you

11      asked her why, and she says because

12      she didn't want it to happen to

13      anybody else.  That was her answer.

14          Now, is that your answer?

15  THE WITNESS:

16          Yes, sir.

17  JUDGE ELLIS:

18          Okay.  Stay away from the

19      merits --

20  MR. WALL:

21          I absolutely will.

22  JUDGE ELLIS:

23          -- of that case.

24  BY MR. WALL:

25      Q.  How did you come to file your

**Exhibit E**

1    complaint with the Board?  How did you get

2    there?

3         A.   I had contacted CIGNA who had

4    originally advised me that Dr. Hunter was

5    covered under our insurance plan.  I called

6    CIGNA to advise them of Dr. Hunter's behavior,

7    and they suggested that I contact --

8    JUDGE ELLIS:

9                   You're through?

10   MR. WALL:

11                  Well, I don't know that she

12           finished the response.

13   BY MR. WALL:

14        Q.   Contact?

15        A.   I contacted CIGNA, and I started to

16   tell them about my complaint, and they advised

17   that I should contact the Louisiana Board of

18   Medical Examiners.

19        Q.   Do you have any ongoing civil

20   litigation against Dr. Hunter?

21        A.   No, sir.

22   MR. TAYLOR:

23                  Objection.

24   BY MR. WALL:

25        Q.   Do you have any plans --

**Exhibit E**

```
 1    MR. TAYLOR:
 2              Objection.  What is that
 3         relevant to?
 4    JUDGE ELLIS:
 5              Nothing.
 6    MR. WALL:
 7              Well, I'll submit that the
 8         relevance, again, is the argument that
 9         he has made that the complaint was not
10         truthful and honest.  He suggested
11         that there was something behind this,
12         some other motivation other than this
13         patient's concern, and I think that's
14         fair to establish that she has no
15         civil litigation and does not intend
16         to have any.
17    MR. TAYLOR:
18              There's another day for that,
19         and it's not here.
20    JUDGE ELLIS:
21              No.  I think he's right.  I
22         think he's right.
23    BY MR. WALL:
24      Q.  And do you have any intentions of
25    filing any civil litigation?
```

**Exhibit E**

1      A.   No, sir.  I've never filed anything

2   like this.

3   MR. WALL:

4              That's all the questions I

5         have.  Thank you.

6   JUDGE ELLIS:

7              Cross-examine.

8         C R O S S - E X A M I N A T I O N

9   BY MR. TAYLOR:

10      Q.   Do you know Dionne Nicole?

11      A.   Doesn't sound familiar, no, sir.

12      Q.   You're sure?

13      A.   How would I know this person?

14   MR. WALL:

15              Objection.

16   JUDGE ELLIS:

17              I didn't hear the question.

18   MR. TAYLOR:

19              I don't have any further

20         questions.

21   MR. WALL:

22              That's all I have.

23   JUDGE ELLIS:

24              Does any member of the Board

25         want to ask this witness anything?

**Exhibit E**

1   THE BOARD:

2                    (No response.)

3   JUDGE ELLIS:

4                    Ms. B███████, thank you very

5            much.  You are through.

6   MR. WALL:

7                    I have no further rebuttal, and

8            I submit my case.

9   JUDGE ELLIS:

10                    Okay.  Gentleman, it's getting

11            late.  Can you sum up in five

12            minutes?

13   MR. WALL:

14                    Yes, sir.

15   JUDGE ELLIS:

16                    Can you?

17   MR. TAYLOR:

18                    Yes, sir.

19   JUDGE ELLIS:

20                    Five minutes.

21   MR. WALL:

22                    How much time do I have?

23   JUDGE ELLIS:

24                    Five minutes.

25   MR. WALL:

**Exhibit E**

1          Five minutes.  Fair enough.
2     Start the clock.  Actually, it's very
3     simple.  It's not going to take me
4     five minutes.
5          The simple reality is that every
6     single day this investigative staff
7     undertakes complaints and deals with
8     issues, and they do it to the best of
9     their ability.  They're not asked to
10    be an arbiter of whether or not a
11    doctor has been involved in the
12    particular allegation or not.  Their
13    job is to investigate.  There's a tool
14    for investigating.  This Board, it's a
15    policy, it's a practice, it's been
16    going on forever, that when there's
17    concern about sexual misconduct and
18    it's legitimate enough that they
19    believe that there is some potential
20    truth to it, we get the experts
21    involved.  They're ordered to go to an
22    -- they're asked to go to an
23    evaluation.  Many doctors agree to do
24    that and go forward.  Ultimately, if
25    they don't agree, they're ordered to

**Exhibit E**

| | |
|---|---|
| 1 | go.  This Board issues the order.  It |
| 2 | is not the investigative staff.  It |
| 3 | wasn't Ms. Rye that issued the order. |
| 4 | It was Dr. Mouton and it was this |
| 5 | Board.  And doctors are obligated to |
| 6 | comply with the orders of this Board. |
| 7 | Absolutely as simple as that. |
| 8 | Financial reasons, other reasons are |
| 9 | not sufficient.  And what will happen |
| 10 | if this Board does not come back on |
| 11 | the issue and sustain this order and |
| 12 | require that Dr. Hunter stay suspended |
| 13 | until he goes to get an evaluation is |
| 14 | that doctors are going to start |
| 15 | challenging the Board's order and it's |
| 16 | going to be expensive and difficult. |
| 17 | There is no reason why Dr. Hunter |
| 18 | should not have complied with the |
| 19 | order.  His failure to comply with the |
| 20 | order is a violation of the Medical |
| 21 | Practice Act.  And he has -- we have |
| 22 | established those charges.  He clearly |
| 23 | acknowledges that he hasn't gone to |
| 24 | the order.  The simple excuse is |
| 25 | finances.  That's not enough.  Thank |

**Exhibit E**

1          you.

2                    Two and a half, maybe less.

3     MR. TAYLOR:

4                    I understand this is hard,

5          because I've never been here before.

6          And I understand the protocols of this

7          Board.  But I ask you to listen very

8          carefully to what has been proposed.

9          Whether or not somebody's innocent or

10          guilty is not the issue, but you

11          execute him anyhow.  Whether or not he

12          did it doesn't matter, but you execute

13          him.  It doesn't matter whether he did

14          it or not.  The suspicion or the

15          accusation alone is enough for you to

16          take his license.  And the evidence

17          before you is there really has not

18          been an investigation.  They talked to

19          the lovely young lady, and they only

20          talked to her, never talked to him.

21          Her testimony alone to an

22          investigator, which of you would like

23          to be judged by that standard,

24          really?  You're not guilty and the

25          panel doesn't decide your guilt.  They

**Exhibit E**

1    have never -- they talked about some
2    lawsuit that they never investigated,
3    don't know the details.  I know the
4    details.  The lawsuit is still
5    pending.  And there are charges of --
6    I'm losing the word -- extortion
7    against Dr. Hunter, okay, targeting
8    him.  Now, that's not before you now.
9    None of that is before you.  What are
10   the facts?  What are the real facts?
11   Well, we'll determine that later.
12   We'll determine whether or not -- but
13   right now we're going to take your
14   license and then we'll have a hearing
15   on whether or not you actually did
16   this later.  So in the meantime your
17   patients don't have a doctor, you are
18   already poor, you're going to get
19   poorer, you're going to go to a
20   program.
21          What I have asked is simply
22   this, is that that's an extreme.  What
23   I ask of you is to come somewhere --
24   you have the power to do that, you
25   have to go to that extreme.  There is

**Exhibit E**

1          a monitoring program.  These people
2          are not only good at what they do,
3          they have a good monitoring program.
4          There is a doctor I did not call.
5          There are letters that went back and
6          forth that said that they can monitor
7          this doctor and set up a program plan
8          and monitor him, give him a chance to
9          stay in practice, give him a chance to
10         at least make some money to go try to
11         get this evaluation.  But I simply
12         raise a simple due process question
13         for you.  It is simply unfair, unfair,
14         a violation of due process to say that
15         we are not here to determine your
16         guilt or innocence, but since you are
17         charged, since you're charged, since
18         somebody made an accusation against
19         you, that's enough for us to take your
20         license.  That is not enough, Ladies
21         and Gentlemen.  That is not enough.
22         And you don't even have the evidence
23         of a fair investigation.  Something
24         else has to happen.  No further.
25         Thank you very much.

**Exhibit E**

1    MR. WALL:

2              Very quickly, since I saved a

3          couple minutes.  The issue is simply

4          whether or not Dr. Hunter complied

5          with an order of this Board.  The

6          order was for an evaluation to help in

7          the investigative process to determine

8          whether or not there is any reason to

9          go forward with the underlying

10         allegations.  The Board had the

11         information in their file that

12         established that there were concerns,

13         and that that's all we simply were

14         doing was trying to get an evaluation

15         as part of the investigative process.

16         The reason why Dr. Hunter is sitting

17         here today with a suspended license is

18         because he refused to go to the

19         order.  Now, whether it's for finances

20         or any other reason, it's immaterial.

21         He did not go get an evaluation;

22         therefore, his license has been

23         suspended.  Had he gone for an

24         evaluation, this matter might have

25         been completely cleared up.  I don't

**Exhibit E**

1        know.  We don't know.  That's part of
2        the process.  This is what the Board
3        requires in these circumstances, and
4        he needed to go to the evaluation.
5        Thank you.
6   JUDGE ELLIS:
7            Okay.  Thank you, gentleman.
8        The Board will take it under
9        advisement.
10       (The proceedings were concluded at
11       5:43 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Exhibit E**

1                R E P O R T E R ' S   P A G E

2                I, SHELLEY A. SAMPEY, Certified

3    Court Reporter in and for the State of

4    Louisiana, the officer before whom this sworn

5    testimony was taken, do hereby state:

6                That due to the spontaneous

7    discourse of this proceeding, where necessary,

8    dashes (--) have been used to indicate pauses,

9    changes in thought, and/or talkovers; that

10   same is the proper method for a Court

11   Reporter's transcription of a proceeding, and

12   that dashes (--) do not indicate that words or

13   phrases have been left out of this transcript;

14               That any words and/or names which

15   could not be verified through reference

16   material have been denoted with the phrase

17   "(assumed spelling)."

18

19

20                    _____
                     SHELLEY A. SAMPEY, CCR/RPR

21

22

23

24

25

1            C E R T I F I C A T E

2            This certification is valid only for a
transcript accompanied by my original
3   signature and original raised seal on this
page.
4            I, **SHELLEY A. SAMPEY**, Certified Court
Reporter in and for the State of Louisiana, as
5   the officer before whom this testimony was
taken, do hereby certify that the Witnesses to
6   whom the oath was administered, after having
been duly sworn by the Board upon authority of
7   R.S. 37:2554, did testify as hereinbefore set
forth in the foregoing pages;

8
         That this testimony was reported by me
9   in stenotype, was prepared and transcribed by
me or under my personal direction and
10   supervision, and is a true and correct
transcript to the best of my ability and
11   understanding;

12            That the transcript has been prepared
in compliance with transcript format
13   guidelines required by statute or by rules of
the board, that I have acted in compliance
14   with the prohibition on contractual
relationships as defined by Louisiana Code of
15   Civil Procedure Article 1434 and in rules and
advisory opinions of the board;

16
         That I am not related to counsel or to
17   the parties herein, nor am I otherwise
interested in the outcome of this matter.

18

19

20

21                            **SHELLEY A. SAMPEY, CCR/RPR**
22   Certified Court Reporter
State of Louisiana,#93011
23   Registered Professional
Reporter, #818291

24

25

*Shelley A. Sampey, RPR/CCR*
*ASAP Court Reporting Services, Inc.*
*(985) 867-5704*

**Exhibit E**